**MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC.**

v.

**AMERICAN BAR ASSOCIATION, et al.**

Civ. A. No. 93–6206.

United States District Court, E.D. Pennsylvania.

July 20, 1994.

Harold E. Kohn, Joanne Zack of Kohn, Nast & Graf, P.C., Philadelphia, PA, Lawrence R. Velvel, Michael L. Coyne, Peter M. Malaguti, Constance L. Rudnick, Andover, MA, for plaintiff.

Barbara W. Mather, L. Suzanne Forbis, of Pepper, Hamilton & Scheetz, Philadelphia, PA, H. Blair White, David T. Pritikin, William H. Baumgartner, Jr. of Sidley & Austin, Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

DITTER, District Judge.

This case involving alleged violations of the federal antitrust laws arising out of the American Bar Association's ("ABA") failure to grant accreditation to the Massachusetts School of Law ("MSL") is before me, again— this time on discovery disputes.[1] In my order of May 20, 1994, I denied plaintiff's motion to compel far-reaching discovery and specified its initial scope and focus was to address a rule of reason analysis. 853 F.Supp. 837. Both plaintiff and the ABA seek alterations of the order.[2] For the reasons discussed below, both motions are granted in part and denied in part.

### I. The Order of May 20, 1994

In its complaint and subsequent filings, plaintiff alleged that the ABA's accreditation standards encompassed in the following six criteria are anticompetitive: salary levels (Standard 405); student-faculty ratio, limits on teaching hours and sabbatical requirement (Standards 201 and 401–405); use of the Law School Admission Test or other test (Standard 503); guidelines for law libraries (Standards 602, 603, and 704); prohibition of for-credit bar review courses (Standard 302(b)); and limits on the hours that students may be employed (Standard 305). In holding that a rule of reason analysis is the appropriate inquiry to conduct on the challenged criteria, I ordered that discovery focus on the following areas for each of the challenged criteria and standards: (1) does the standard have an anticompetitive effect; (2) are redeeming virtues claimed for the standard; and (3) is there a way to achieve the redeeming virtue that would be less restrictive of competition?

The order was not intended to limit discovery within the rule of reason analysis, but rather to preclude at this time discovery outside of, or irrelevant to, that analysis. Therefore, I held that plaintiff was not entitled, as it sought, to obtain ABA files and documents of all ABA-accredited law schools, because the rule of reason considers whether a restraint on competition is unreasonable, not whether the restraint has been uniformly and systematically applied. An unreasonable restraint will not be saved by virtue of its having affected all competitors equally; a reasonable restraint will not be condemned because it affected some competitors more than others. So that MSL would have the clearest possible picture of how the accreditation process was carried out as far as MSL was concerned, the order stated that MSL *is* entitled to the ABA's accreditation files and all information maintained on MSL.

MSL filed a motion for reconsideration of the discovery order, seeking the broader dis-

---

1. For a detailed recitation of the facts and plaintiff's allegations, see *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 846 F.Supp. 374, 376–77 (E.D.Pa.1994).

2. The ABA did not file a motion for reconsideration titled as such, but rather filed a "submission concerning ABA Standards 405(a), 602, 603, and 704." I will consider this as a motion for reconsideration, as it seeks to alter the order of May 20.

covery that had been denied. The ABA also sought reconsideration, seeking to exclude discovery related to Standards 405(a), 602, 603, and 704, claiming that the decision not to accredit MSL had not been based on these standards and so they had not been a cause of MSL's alleged injury.

## II. The ABA's Motion for Reconsideration

■ In its complaint, MSL alleges that because it publicly and actively opposed ABA's anticompetitive accreditation criteria, MSL asked ABA for accreditation through a variance, that is, asked ABA not to apply its criteria to MSL but to accredit it anyway.

MSL goes on to allege that following its application for accreditation, an ABA site review team inspected MSL and wrote a highly critical report. There followed, according to the complaint, a recommendation by the Accreditation Committee of the ABA's Section of Legal Education that provisional accreditation not be granted. Acting on MSL's appeal, the Council of the Section on Legal Education recommended, on the same grounds stated by the committee, that accreditation not be granted. The Board of Governors of the ABA declined to act on MSL's appeal from the council decision and although MSL has appealed to the ABA's House of Delegates, such an appeal will be futile.[3]

The council stated these reasons for its refusal to recommend accreditation:

(a) The School's very high student/faculty ratio [Standards 201 and 401–405 and adopted Interpretations thereof].

(b) The School's substantial reliance upon instruction by part-time faculty members [Standard 403(a)].

(c) The heavy teaching loads of members of the full-time faculty [Standard 404(a)].

(d) The School's failure to accord faculty members reasonable opportunities for leaves of absence [Standard 405(b)].

(e) The School's inclusion of a six-credit bar review course in its curriculum [Standard 302(b), the adopted interpretation of Standard 301, and Council Policy 21].

(f) The School's failure to adhere to the ABA's requirements relating to field placement programs [Standard 306 and adopted Interpretation 2 thereof].

(g) The School's failure to demonstrate that its class schedule for 1992–93 consisted of no fewer than 140 days on which classes were regularly scheduled throughout the day [Standard 305(b) and adopted Interpretation 6 thereof].

(h) The School's decision not to adopt and enforce policies ensuring that individuals who enroll as full-time students devote substantially all of their working hours to the study of law [Standard 305(c) and adopted Interpretation 7 thereof].

(i) The School's failure to demonstrate that it is using an acceptable test to determine apparent aptitude for law study [Standard 503].

(j) The School's failure to adopt a written plan describing its program for achieving compliance with Standard 212 [Standard 212, Council Policy 19, and Council Policy 28].

(k) An inadequate physical plant [Standards 701–703 and adopted interpretations thereof].

The ABA seeks reconsideration of the discovery order so that discovery pertaining to standards 405(a), 602, 603, and 704, will be precluded, arguing that denial of accreditation to MSL was not based on these standards and that MSL cannot be said to have been injured by them. If the standards in question did not cause the injury complained of, the ABA contends, there is no need to have discovery on those standards. Standard 405(a) addresses faculty salaries, while standards 602, 603, and 704 discuss law school libraries.

MSL argues in opposition to the ABA's motion that the site inspection team commented on and criticized MSL's salary scale and that the ABA accreditation committee and council did in fact base their recommendations that accreditation be denied on stan-

---

**3.** The House of Delegates rejected MSL's appeal in February, 1994. It follows that the council's recommendation not to grant accreditation became the ABA's decision.

dard 405. Further, MSL claims that the ABA links salary with student-faculty ratio, and so denying MSL accreditation (in part) because of its high student-faculty ratio was really a denial based on salary. In addition, MSL says that because it would have to adhere to the salary standard in the future, it can challenge the standard now. Finally, MSL says that standard 405(a) is a crucial part of the alleged conspiracy and therefore, is relevant to plaintiff's case. MSL claims much of the same argument with regard to standards concerning libraries, numbered 602, 603, and 704.

The evidence presently at hand does not support MSL's contention that one of the reasons the ABA declined to accredit MSL was noncompliance with the salary (405(a)) or library (602, 603, and 704) standards. The decision letters of both the committee and the council mention standard 405 only in the context of MSL's student-faculty ratio, concluding that MSL was not in compliance with the ratio standard. While it is part of standard 405, there is no specific reference to standard 405(a) and no reference to faculty salaries in either the committee's or the council's letters about accreditation.

Despite MSL's urging, I cannot agree that reference to standards 401–405 and to their interpretations, following a specific reference to MSL's student-faculty ratio, shows that the decision to deny MSL accreditation was really based on its faculty salaries. Standards 402 and 403 discuss the importance of having sufficient full-time faculty; standard 404 refers to teaching loads. While standard 405 refers to faculty salary and resources, the interpretations of that standard also refer to small-group classes, the value of sufficient time for faculty to meet with students, and the importance of faculty members having time to write, to serve the community, and to improve one's teaching—all matters on which student-faculty ratio would have an impact.

The fact that the site team report discussed MSL's faculty salaries also does not

support the contention that salary was an unspoken reason for the ABA to withhold accreditation. The site team collects information and reports on *all* matters addressed by the standards; reference to MSL's salary schedule by the site team does not mean that the committee and council relied on salary in its decision.[4]

MSL also argues that because the accreditation committee's letter raised issues of concern about MSL's law library, the ABA's library standards (standards 602, 603, and 704) are valid areas of discovery. While the committee's letter does mention the library standards, neither the committee's nor the council's conclusions include the library standards in the reasons given for recommending that MSL not be accredited. Indeed, the council's letter makes no mention of the library standards at all. Therefore, MSL's contention that these standards injured MSL is not persuasive.

MSL's assertion that the ABA links student-faculty ratio and salary, so that criticism of one is really criticism of the other, defies logic. To the extent that ratio and salary would be interdependent, they would not travel hand in hand but would have an adverse effect on each other: high faculty salaries (perceived as a good thing by ABA) would be linked to a high student-faculty ratio (perceived as a bad thing), while the reverse would also be true. For example, if a law school budgets $1,000,000 for professors' salaries and has ten faculty members, their average salary would be $100,000. If the same law school had 20 professors, the average salary would be $50,000. In the first case, however, the student-faculty ratio would be twice that of the second. The high ratio would be assailed and the high salaries lauded in the former, while the low ratio would be commended and the low salaries criticized in the latter. All I am saying is the obvious: that a high student-faculty ratio shows that a law school has more students per professor and a low ratio shows that a school has fewer students per professor; nei-

---

4. The site team does not determine whether or not a law school has complied with the standards, but only reports facts and observations on which the committee and council may base their recommendations and decisions. *Rules of Procedure for Approval of Law Schools by the American Bar Ass'n,* Rule 8.

ther shows anything at all about either school's average salary. This is not to say that a law school may not have many professors (and therefore a low ratio) *and* pay them handsomely, or that a law school may not have only a few professors (and therefore a high ratio) who are paid poorly. But criticism of salary levels does not follow from criticism of student-faculty ratio, and it does not follow that one of the stated bases for the ABA's decision not to accredit MSL—a high student-faculty ratio—masked a different, "linked" reason, that of insufficient faculty salaries.

The fact that MSL may be found at some time in the future not to be in compliance with standards 405(a), 602, 603, or 704 does not mean that the standards are causing injury now, or that this case should now address or remedy possible future harm. MSL has said that it is not challenging accreditation as a whole, but only specific anti-competitive criteria. If MSL's reason to have discovery on these standards is that MSL may be harmed by them in the future, then it would seem that *every* ABA accreditation standard should presently be at issue and open to discovery—something MSL has acknowledged it is not seeking.[5] Moreover, the problem with this argument is that MSL has never said that it would try to comply, that it wants to comply, or that it is unable to comply with the faculty salary and library standards. All MSL says is that it has "publicly and actively opposed" ABA's criteria and wants accreditation on its terms rather than on the ABA's terms.

Finally, MSL argues that it is entitled to discovery on standards 405(a), 602, 603, and 704 because plaintiff is entitled to discovery on all aspects of the conspiracy at issue. The short answer to this is that standards 405(a), 602, 603, and 704 are not part of the conspiracy "at issue." They may be part of a conspiracy MSL would like to have at issue, but on the face of things as they now appear, standards 405(a), 602, 603, and 704 are not at issue because they were not adversely ap-

plied to MSL and MSL does not suggest how it was injured by those standards.

The cases plaintiff cites in support of its argument for discovery are not particularly on point. For example, plaintiff cites *In re Lower Lake Erie Iron Ore Antitrust Litigation* for the proposition that a plaintiff can assail an entire conspiracy because damages are caused by the overall effectiveness of the conspiracy. 998 F.2d 1144, 1172 (3d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994). Plaintiff refers to the part of the decision that concerns "injurious acts" within the statute of limitations, offered by a plaintiff to prove damages, as opposed to "overt acts" outside of the limitations period to prove conspiracy. *Id.* at 1171–72. That is not the issue here. MSL is not seeking discovery on injurious acts within the limitations period concerning, say, the student-faculty ratio, which MSL alleges caused it injury. Rather, MSL is seeking discovery on a standard that cannot be said to have caused injury to MSL because it was not a reason the ABA decided against accrediting MSL.

In another case plaintiff refers to, the Third Circuit discussed proof of concerted action. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1364–65 (3d Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). The court stated that "evidence should be analyzed as a whole, rather than compartmentalized, to determine whether it supports an inference of concerted action." *Id.* at 1364 (citation omitted). Proving (or inferring) concerted action is not what the current dispute is about. This dispute involves whether MSL is entitled to discovery on accreditation standards, or restraints, which were not the basis of plaintiff's injury. The conspiracy is not being divided up arbitrarily by not allowing the discovery. Rather, discovery is being divided into accreditation standards alleged to have harmed MSL, on which discovery is allowed, and other accreditation standards, on which discovery is not allowed because

---

5. The Standards Review Committee of the ABA has suggested revisions of Standard 405(a). The House of Delegates will consider the revisions next year. While this may indeed render moot MSL's argument of future harm, I do not base my decision on a possible action that the ABA may take at a later time.

MSL has not suggested how it was harmed by them.

Plaintiff also cites *Continental Ore Co. v. Union Carbide and Carbon Corp.* for the proposition that proof of conspiracy should not be compartmentalized. 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). MSL's case is not similar to that of the plaintiff in *Continental Ore.* In that case, plaintiff alleged that it suffered injury when defendants' Sherman Act violations frustrated plaintiff's efforts to enter into metal trading, and caused the collapse, termination, or frustration of five of plaintiff's attempted ventures. *Id.* at 694–95, 82 S.Ct. at 1408. The Supreme Court held that it was improper of the Court of Appeals to have viewed plaintiff's claims as if they were five separate, unrelated lawsuits. That is not the same issue here. MSL's injury was allegedly caused by the ABA's enforcing certain accreditation standards with which MSL did not want to comply. Under *Continental Ore,* this means I should not view as separate lawsuits the injury allegedly suffered by MSL from the student-faculty ratio standard, the standard prohibiting for-credit bar review courses, the standard concerning length of the academic year, and so on, but should view as a whole the conspiracy to enforce these standards. But *Continental Ore* does not mean that I should view as part of the conspiracy standards which were not the basis for the decision not to accredit MSL and so did not cause MSL's injury.

Because the ABA's decision not to accredit plaintiff was based on noncompliance with standards other than 405(a), 602, 603, and 704, these standards cannot be said to have injured MSL. Therefore, the ABA's motion for reconsideration as to these standards must be granted, and the discovery order of May 20, 1994, must be amended to exclude at this time discovery about the development, implementation, discussion, and debate of these standards. Discovery on them *is* permitted, however, to the extent it is necessary to determine if these standards were in fact reasons MSL was denied accreditation. The

order of May 20 made clear that MSL is entitled to discovery on all aspects of *its* ABA accreditation file and of ABA discussions and decisions concerning MSL. From those materials it should be sufficient to ascertain if standards 405(a), 602, 603, or 704 were the basis for the decision of any ABA body to deny MSL accreditation. If they were, further discovery on these standards will be allowed.

### III. MSL's Motion for Reconsideration

■ MSL argues that ABA-compiled law school statistics, which are discoverable under the May 20 order, will not be sufficient to enable MSL to carry its burden of proving that the ABA's accreditation standards caused anticompetitive effects, as it must under a rule of reason analysis. Rather, MSL asserts, it needs complete information about individual law schools' accreditation to show that, because of ABA enforcement of its standards, the individual law schools were required to hire more professors, decrease teaching loads, raise tuition, and so on, all or some of which had an anticompetitive effect.

The ABA contends that MSL does not need accreditation information on individual schools because such information has no bearing on whether the restraints are reasonable. Further, the ABA argues that it would be burdensome to produce accreditation documents on numerous law schools and, moreover, that the information is confidential. A law school seeking accreditation, the ABA explained, submits private, self-critical information to the ABA, with the expectation that it will not be disclosed to the public and to the law school's competitors. Even if it loses this case, MSL would profit greatly if through discovery it had gained access to its competitors' comments about their individual deficiencies, information MSL could then use to promote its place in the market.[6] The ABA's concern, though made known to MSL and its attorneys, has not generated any assurances of maintaining confidentiality or a pledge of non-use for promotional purposes. It follows that there may be good reason

---

**6.** It is not mere speculation that MSL might use confidential information about other law schools to its own advantage. One article about this case commented that MSL has "bombarded journalists" with a regular stream of press releases.

quite apart from the usual burdens of discovery for honoring the ABA's request.[7]

MSL argues in its supplemental memorandum that the evidence it seeks is analogous to that put forth in *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). That case involved allegations that the NCAA unreasonably restrained trade in awarding television rights for college football games. *Id.* at 89, 104 S.Ct. at 2954. As MSL notes, the Supreme Court looked at how the NCAA's plan for televising football games had developed, and found that schools received the same payments from the television networks regardless of the games' audience, market share, or reputation of the teams involved. *Id.* at 93, 104 S.Ct. at 2956. The facts of that case, however, do not support MSL's contention that the evidence it seeks to discover about all law schools is similar to the evidence considered by the courts in *NCAA.* For instance, the district court in *NCAA* gave an example of how four schools playing in two games on the same day each received the exact same television payment even though one of the games involved two schools far lesser known than plaintiff, the University of Oklahoma. *Id.* at 107 n. 33, 104 S.Ct. at 2963 n. 33 (citing district court opinion). The comparison involved one of the plaintiff schools and was an example of how the NCAA's television plan injured plaintiff because, presumably, its game would have been worth more to the network to televise than the game between the two lesser-known schools. Moreover, the plaintiffs in *NCAA* were asserting that the plan for televising football injured them, and that is the evidence the court addressed—not how much each school spent on football as compared to other athletic programs, or what the NCAA's television policies were for other collegiate athletics, or how the NCAA policy affected other schools' football teams and athletic programs. Furthermore, the district court seemed to glean its evidence from an examination of the NCAA television contract and its associated "recommendations" to television networks, not from school-specific data

and individualized records from each school's athletic department. *Board of Regents of the Univ. of Okla. v. National Collegiate Athletic Ass'n,* 546 F.Supp. 1276, 1289–91 (W.D.Okla. 1982). In short, I find that the evidence considered in *NCAA* is not analogous to the sweeping accreditation evidence MSL seeks about all other law schools and their adherence to, or deviation from, the ABA standards.

In any event, MSL's argument is premature at best. Before MSL delves into the accreditation file of a specific law school, how it prepared for inspection, and how it reacted or responded to ABA decision letters, MSL must first show that the accreditation process had an adverse effect on law school competition generally or on a law school individually. To that end, MSL is entitled to discovery in the aggregate about the effects of accreditation on competition.

As a starting point at least, the anticompetitive effects of the accreditation standards may come from statistics about competition among law schools. If the accreditation standards adversely affected competition, the results would likely begin to appear in the years after a law school received a decision letter. Therefore, MSL is entitled to discovery that would show law schools' tuitions, enrollment, number of applicants, number of full- and part-time faculty members, and student-faculty ratio in the years before a decision letter was issued, and in the several years afterward. If these data did not change following an accreditation decision letter, it is doubtful that permitting MSL to rummage through the files of the individual law school will show an anticompetitive effect from the same accreditation process. Of course, if, for example, tuition increased following a decision letter, it does not necessarily mean that the accreditation standards were the cause. There may be a wholly separate reason: perhaps a state legislature reduced support for a state school, or university trustees raised law school fees to finance new undergraduate dormitories. On the other hand, if there were no deleterious effects

---

7. No Chinese wall is possible in view of the participation by MSL's faculty as its attorneys on

behind-the-scenes discovery matters, document drafting, and legal research.

on competition as evidenced by the data, then there would be no reason for MSL then to obtain action letters and information about specific law schools.

The ABA shall provide the information described above for all accredited law schools. The ABA shall provide the data for at least the two years before a committee or council decision letter issued and the several years after, indicating in what year the decision letter was issued. The ABA need not provide the names of the law schools, but shall maintain an internal reference so that a school designated as "No. 1" or "No. 176" may be identified later if necessary.

### IV. Conclusion

For the reasons stated above, both MSL's and the ABA's motions for reconsideration are being granted in part and denied in part. The discovery order of May 20, 1994, is amended to exclude discovery by MSL of ABA standards 405(a), 602, 603, and 704, except that MSL may inquire into the ABA's records and files concerning MSL's accreditation application and the ABA decisions and discussions about MSL, in order to determine if any or all of those standards did in fact form the basis of the decision not to accredit MSL. The order is also amended to allow discovery by MSL of the ABA's compiled data and statistics from all accredited law schools, showing the tuitions, enrollment, number of applicants, number of full- and part-time faculty members, and student-faculty ratio in at least the two years before a decision letter was issued, and in the several years afterward. An appropriate order follows.

### ORDER

AND now, this 20th day of July, 1994, it is hereby ordered that the motions for reconsideration of the May 20, 1994, order of plaintiff and defendant, the ABA, are GRANTED in part and DENIED in part. The order is amended as follows:

1. MSL is not entitled to discovery pertaining to ABA standards 405(a), 602, 603, and 704 generally. MSL is entitled to discovery on these standards as applied to MSL's application, to the extent necessary to determine if any of these standards were the basis for the ABA's decision not to accredit MSL.

2. MSL may obtain from the ABA data and statistics from all accredited law schools, giving the schools' tuitions, enrollment, number of applicants, number of full- and part-time faculty members, and student-faculty ratio for at least the two years before a decision letter was issued, and in the several years afterward. The ABA shall not name the law schools, but shall maintain an internal reference so that they may be identified later if necessary.