

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-28-1997

# MA Sch of Law v. Amer Bar Assn

Precedential or Non-Precedential:

Docket 96-1792

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"MA Sch of Law v. Amer Bar Assn" (1997). *1997 Decisions.* Paper 50.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/50

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

No. 96-1792

MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC.

v.

AMERICAN BAR ASSOCIATION; LAW SCHOOL ADMISSION
SERVICES, INC.; LAW SCHOOL ADMISSION COUNCIL;
THE ASSOCIATION OF AMERICAN LAW SCHOOLS, INC.;
JAMES P. WHITE; NINA APPEL; JOSE R. GARCIA-PEDROSA;
LAURA N. GASAWAY; FREDERICK M. HART; RUDOLPH C. HASL;
CARL C. MONK; R. W. NAHSTOLL; HENRY RAMSEY, JR.;
NORMAN REDLICH; JOHN E. RYAN; GORDON D. SCHABER;
PAULINE SCHNEIDER; STEVEN R. SMITH; CLAUDE R. SOWLE;
ROBERT A. STEIN; RENNARD STRICKLAND; ROY T. STUCKEY;
LEIGH H. TAYLOR; FRANK K. WALWER; SHARP WHITMORE;
PETER A. WINOGRAD

Massachusetts School of
Law at Andover, Inc.
("MSL"),

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 93-06206)

Argued December 10, 1996

BEFORE:  BECKER, MANSMANN, and GREENBERG, Circuit Judges

(Filed: February 28, 1997)

Michael M. Baylson (argued)
Elise E. Singer
Edward G. Beister, III
Melissa H. Maxman
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, PA 19103-7396

Lawrence R. Velvel (argued)
Michael L. Coyne
Constance L. Rudnick

1

Peter M. Malaguti
Massachusetts School of Law at
Andover
500 Federal Street
Andover, MA 01810

Attorneys for Appellant


David T. Pritikin (argued)
Jeffrey H. Dean
David R. Stewart
Sidley & Austin
One First National Plaza
Chicago, IL 60603

Barbara W. Mather
L. Suzanne Forbis
Pepper, Hamilton & Scheetz
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103-2799

Attorneys for Appellees
American Bar Association
James P. White, Nina
Appel, Jose R. Garcia-

Pedrosa, R.W. Nahstoll,
Henry Ramsey, Jr., Norman
Redlich, John E. Ryan,
Gordon D. Schaber,
Pauline Schneider,
Steven R. Smith, Claude
R. Sowle, Robert A.
Stein, Rennard
Strickland, Roy T.
Stucky, Leigh H.
Taylor, Frank K. Walwer,
Sharp, Whitmore, and
Peter A. Winograd


Mark P. Edward (argued)
Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA 19103

Attorneys for Appellees
Law School Admission
Services, Inc. and Law

                              School Admission Council


                    Robert A. Burgoyne

                                      (argued)
                    Stephen M. McNabb
                    Fulbright & Jaworski
                    801 Pennsylvania Avenue,
          N.W.

                    Washington, DC 20004

                              Attorneys for Appellees
                              The Association of


                              American Law Schools,
                              Inc. and Carl C. Monk


                    Joel I. Klein
                    Acting Assistant Attorney
          General

                    A. Douglas Melamed
                    Deputy Assistant Attorney
                    General
                    Catherine G. O'Sullivan
                    Andrea Limmer
                    Marion L. Jetton
                    Attorneys
                    Department of Justice
                    950 Pennsylvania Ave. N.W.
                    Washington, D.C. 20530-0001

                              Attorneys for United
                              States as Amicus Curiae

_____

OPINION OF THE COURT

_____


GREENBERG, Circuit Judge.

        This case is before this court on appeal from an order

of the district court granting summary judgment on all counts to

the appellees in this antitrust action brought against them by

the Massachusetts School of Law at Andover, Inc. ("MSL"). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337, and this Court has jurisdiction under 28 U.S.C. § 1291. This appeal principally presents a number of questions regarding the scope of immunities from the antitrust laws and related antitrust discovery issues. An examination of the parties and conduct in question is first necessary.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Parties

MSL has been operating a law school in Massachusetts since 1988. The Board of Regents of Massachusetts authorized MSL to grant the J.D. degree in 1990. This authority allowed MSL's graduates to take several bar examinations, including that in Massachusetts. MSL has the stated policy of providing low-cost but high quality legal education and attracting mid-life, working class, and minority students. MSL facilitates this policy with its admissions procedure and a tuition of $9,000 per year. Many of MSL's policies and practices conflict with American Bar Association ("ABA") accreditation standards, and MSL aggressively has sought changes in those standards.

The ABA, a national professional organization of attorneys whose membership is open to members of any bar in the United States, has been concerned with legal education and bar admissions throughout its history. In 1921, through its Section of Legal Education and Admissions to the Bar (the "Section"), the ABA first developed standards of accreditation for legal

education programs. The ABA petitioned state supreme courts to rely on its accreditation decisions in connection with bar admission decisions. Now, all 50 states and the District of Columbia consider graduation from an ABA-accredited law school sufficient for the legal education requirement of bar admission. App. at 1396-1409. The United States Secretary of Education considers the Council of the Section to be the national agency for accreditation of professional schools of law and a reliable authority concerning the quality of legal education. App. at 3378. The ABA informs the states of its accreditation decisions and annually sends them the Review of Legal Education in the United States, the ABA accreditation standards, and any proposed revisions of the standards. During the period at issue, there were 177 ABA-accredited law schools in the United States and over 50 unaccredited schools with some form of state approval such as MSL enjoys. The ABA consistently has opposed attempts to change or waive bar admission rules to allow graduates of schools not accredited by the ABA to take the bar examination. See, e.g., app. at 3623-53.

Many states have methods of satisfying the legal education requirement other than graduation from an ABA-accredited school. These methods include legal apprenticeship, practice in another state, and graduation from a school approved by the American Association of Law Schools ("AALS") or a state agency. The AALS is an association of 160 law schools which serves as a learned society for law schools and legal faculty and as a representative of the law school community with the federal

5

government and other education organizations. Furthermore, in every state, a bar applicant or law school can petition the bar admission authority for revision or waiver of the rules. MSL won a waiver of New Hampshire's rules to allow its graduates to take the bar in 1995, and has filed petitions seeking similar relief in Connecticut, Maine, New York, and Rhode Island. Maryland and Washington, D.C. have granted petitions of graduates of MSL to take the bar. MSL graduates can take the bar examination immediately after graduation in California, Massachusetts, New Hampshire, Vermont and West Virginia, and in 12 other states after practicing in another state first.

The ABA allows graduates of non-accredited schools to join the ABA once they are admitted to a bar and does not prohibit its members from hiring or otherwise dealing with graduates of such schools. The ABA does not prevent its members from teaching at non-ABA-accredited schools, but it does not allow its accredited schools to let students transfer credits from unaccredited schools or to accept graduates of unaccredited schools into graduate programs.

ABA accreditation is open to any law school that applies and meets the ABA standards. The ABA grants provisional accreditation to schools that substantially comply with its standards and promise to comply fully within three years. An Accreditation Committee makes an initial evaluation of a school for provisional accreditation and gives a recommendation to the Council of the Section. The Council then makes a recommendation

6

to the ABA House of Delegates, which has the ultimate decision-making authority.

A law school must have been teaching students for five years and graduated three classes to be eligible for AALS membership. The AALS holds an annual meeting, professional conferences and workshops,[1] and publishes the Journal of Legal Education. All of its current members are ABA-accredited, but accreditation is neither necessary nor sufficient for membership approval. The AALS accredits schools in the sense that it determines whether a school meets its membership requirements, but it has accreditation standards and procedures separate from those of the ABA. The AALS conducts a site visit, independently of the ABA, when a school applies for membership, and it conducts periodic visits after membership, usually jointly with the ABA if the school is ABA-accredited. The AALS is not involved with site inspections for provisional ABA accreditation, such as the one the ABA undertook at MSL.

The Law School Admissions Council, Inc. ("LSAC") is the successor organization to the Law School Admission Council and Law School Admission Services, Inc. The LSAC, as have its predecessors, administers the Law School Admissions Test ("LSAT"). The LSAC is not affiliated formally with either the ABA or the AALS and does not participate in the ABA accreditation process. Membership in the LSAC is open to any United States law

_____

1. The AALS does not prohibit non-members from attending these conferences, and representatives of MSL have attended them, even though MSL is not a member and never has applied for membership. App. at 2279-80.

school that (1) requires that "substantially all of its applicants for admission take the Law School Admission Test," and (2) is ABA-accredited or an AALS member. App. at 2552. MSL does not require the LSAT, never has applied for AALS membership, and is not ABA-accredited, so thus is not eligible for LSAC membership.

In addition to administering the LSAT, the LSAC performs a number of other services. The Candidate Referral Service ("CRS") provides lists of names and addresses of people who have taken the LSAT. Use of the CRS is open to any school which has degree granting authority from a state, regardless of LSAC membership or ABA accreditation, and MSL has made use of this service. App. at 2410-12, 2511-12, 2427-29. The Law School Data Assembly Service ("LSDAS") provides a summary of a law school applicant's college record and LSAT score. LSDAS is also open to all schools and has been used by MSL. App. at 2410-12. The LSAC publishes a handbook, The Official Guide to U.S. Law Schools, with a two-page description of each United States LSAC member school, and two appendices with the names and addresses of Canadian LSAC members and unaccredited United States law schools, including MSL, known to the LSAC. The LSAC also sponsors regional recruiting forums for law school applicants and conferences of pre-law advisors which are only open to LSAC members.

## B.  The Complaint

MSL applied for provisional ABA accreditation during the fall of 1992 and early 1993. MSL never claimed it was or

8

would be in compliance with ABA standards, but instead asked for a waiver under Standard 802 which allows the Council to grant variances from the standards. Following the established process, a seven-member site evaluation team appointed by and representing only the ABA visited MSL and then prepared a 76-page report which was sent to MSL. MSL sent a 90-page response to the site team report.

The Accreditation Committee, after reviewing the site report and the MSL materials, and hearing a presentation from six MSL representatives, recommended denial of MSL's accreditation application because it did not meet the ABA requirements. The Committee also recommended denial of the waiver request. In a letter to MSL explaining its denial recommendation, the Committee listed 11 areas where MSL failed to comply with ABA standards. App. at 837-48. These areas included the high student/faculty ratio, over reliance on part-time faculty, the heavy teaching load of full-time faculty, the lack of adequate sabbaticals for faculty, the use of a for-credit bar review class, the failure to limit the hours students may be employed, and the failure to use the LSAT or give evidence validating its own admission test.[2] App. at 845-46. The body of the letter discussed the inadequacy of MSL's law library, but the letter did not cite that inadequacy as one of the reasons for the denial recommendation. App. at 842-43; see app. at 845-46. The letter did not discuss the

_____

2. MSL challenged all these standards, as well as standards on faculty salaries and law libraries, in its antitrust complaint.

9

salaries of MSL's faculty.  Invoking ABA procedures, MSL appealed but, after a full review at which MSL had the opportunity to make a presentation, the denial of accreditation was upheld on February 8, 1994.

MSL filed this action on November 23, 1993, alleging that the ABA, AALS, LSAC, and 22 individuals combined and conspired to organize and enforce a group boycott in violation of section 1 of the Sherman Act and conspired to monopolize legal education, law school accreditation, and the licensing of lawyers, in violation of section 2 of the Sherman Act.  15 U.S.C. §§ 1-2.  The complaint basically alleged that the appellees conspired to enforce the ABA's anticompetitive accreditation standards by:  (1) fixing the price of faculty salaries; (2) requiring reduced teaching hours and non-teaching duties; (3) requiring paid sabbaticals; (4) forcing the hiring of more professors in order to lower student/faculty ratios; (5) limiting the use of adjunct professors; (6) prohibiting the use of required or for-credit bar review courses; (7) forcing schools to limit the number of hours students could work; (8) prohibiting ABA-accredited schools from accepting credit transfers from unaccredited schools and from enrolling graduates of unaccredited schools in graduate programs; (9) requiring more expensive and elaborate physical and library facilities; and (10) requiring schools to use the LSAT.[3]  MSL alleged that enforcement of these

_____

3.    MSL alleges that a self-interested cabal of legal educators who enforce the allegedly anti-competitive criteria to their own advantage has "captured" the ABA accreditation process.

10

anticompetitive criteria led to the denial of its application for provisional accreditation and caused MSL to suffer a "loss of prestige" and direct economic damage in the form of declining enrollments[4] and tuition revenue.

After MSL filed its complaint, the Antitrust Division of the United States Department of Justice ("DOJ") began an investigation of the ABA's accreditation process and on June 27, 1995, filed suit against the ABA in the United States District Court for the District of Columbia alleging violations of section 1 of the Sherman Act. The ABA entered into a consent decree with the DOJ on June 25, 1996, settling that case.

After a period of discovery under Rule of Reason standards, the district court granted the appellees summary judgment on both counts. The court held MSL did not suffer a cognizable antitrust injury; any disadvantage it incurred was attributable to the decision by the individual states to preclude graduates of unaccredited schools from taking bar examinations, and such injury "cannot be the basis for antitrust liability" under Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523 (1961). Massachusetts School of Law v. American Bar Ass'n, 937 F. Supp. 435, 441 (E.D. Pa. 1996). The court also held that to the extent that the unaccredited status creates a stigma which injures MSL, Noerr precludes recovery for the injury because it is "incidental to the primary,

---

4.     MSL says that its entering classes are now only 40% of what they were before the denial of accreditation. MSL br. at 4.

11

protected injury resulting from governmental decisions to preclude MSL graduates from taking certain bar examinations." Id. at 442. In the alternative, the court held that even if the stigmatic injury were not incidental to Noerr-protected conduct, the claim still would fail because the ABA has done nothing more than express its opinion, which is speech protected by the First Amendment, and not conduct for which there can be antitrust liability. Id. at 442-46.

MSL appeals from the order for summary judgment and a number of prior orders related to discovery, the dismissal of the individual appellees for lack of personal jurisdiction, the denial of a motion to recuse Judge Ditter, and the disqualification of MSL's inside counsel. The DOJ has filed an amicus brief arguing that the district court erred in holding that any stigmatic injury from non-accredited status was incidental to a Noerr-protected injury to the extent that there was no actual petitioning of government in this case. The DOJ also argues that the district court erred in holding that the First Amendment immunizes anticompetitive effects brought about through speech.

## II.  DISCUSSION

### A.  Standard of Review

We review a district court order granting summary judgment de novo both as to factual and legal questions. Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998

12

F.2d 1224, 1230 (3d Cir. 1993).  We review discovery orders under an abuse of discretion standard.  Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 90 (3d Cir. 1987); Marroquin-Manriquez v. INS, 699 F.2d 129, 134 (3d Cir. 1983).  As germane here, MSL has to show that the district court's denial of discovery "made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible." In re Fine Paper Antitrust Litig., 685 F.2d 810, 818 (3d Cir. 1982) (citation omitted).  We review the district court's denial of the motion for recusal for abuse of discretion.  Blanche Road Corp. v. Bensalem Township, 57 F.3d 253, 265 (3d Cir.), cert. denied, 116 S.Ct. 303 (1995); United States v. Antar, 53 F.3d 568, 573 (3d Cir. 1995).

### B.  Discovery Issues

#### 1. Price Fixing

MSL argues that a district court order of May 20, 1994, which held that the ABA standards were not price fixing and per se unlawful and that discovery would proceed under a Rule of Reason analysis, MSL, 853 F. Supp. 837 (E.D. Pa. 1994), is contrary to law and should be reversed.  MSL contends that the district court held in this order that "the ABA had not fixed prices," and that that holding is contrary to settled law.  MSL br. at 40.  This argument mischaracterizes the district court's holding.  As the district court correctly noted, ABA Standard 405(a) (considering faculty salaries as part of school's ability to attract and retain quality faculty) is somewhat vague. Although not dispositive, the lack of a specific price floor or

13

ceiling suggests that the standard represents something other than a classic price-fixing arrangement. MSL, 853 F. Supp. at 840. The court, however, did say that the standard was "price-affecting," which in many cases is sufficient for a per se approach. Id. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221-24, 60 S.Ct. 811, 843-46 (1940).

The court properly then went on to consider the context of the case. In this regard, it is significant that the ABA is a professional society and the Supreme Court has indicated that it has "been slow to condemn rules adopted by professional societies as unreasonable per se," even when the behavior resembles conduct usually subject to a per se approach. FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 458, 106 S.Ct. 2009, 2018 (1986) (Rule of Reason approach even though behavior resembled group boycott); see also National Soc'y of Prof. Eng. v. United States, 435 U.S. 679, 692-94, 98 S.Ct. 1355, 1365-66 (1978) (using Rule of Reason analysis even though agreement affected prices); Goldfarb v. Virginia State Bar, 421 U.S. 773, 788 n.17, 95 S.Ct. 2004, 2013 n.17 (1975) (distinguishing between practice of professions and other business activities); United States v. Brown Univ., 5 F.3d 658, 672 (3d Cir. 1993) (Rule of Reason approach used even though behavior resembled price fixing).

MSL nevertheless argues that the price fixing aspect of the ABA standards has infected the entire conspiracy, justifying a per se approach, and that the Supreme Court has discouraged finding new exceptions to the per se standard. See FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 428-31, 110

14

S.Ct. 768, 778-79 (1990).  We, however, do not apply a new exception to the per se approach here.  Rather, the use of the Rule of Reason is appropriate here because where "a conspiracy of this sort is alleged in the context of a profession, the nature and extent of [the] anticompetitive effect are too uncertain to be amenable to per se treatment."  Wilk v. American Medical Ass'n, 719 F.2d 207, 221 (7th Cir. 1983).

MSL also appeals the district court's July 20, 1994 discovery order which held that MSL had not been injured by the alleged price fixing, and therefore denied discovery as to the faculty salary standard except insofar as it related to MSL's accreditation application.  MSL, 857 F. Supp. 455 (E.D. Pa. 1994).  Contrary to MSL's argument, this order did not hold as a final matter that the alleged salary fixing had no impact on MSL.  It merely stated that "the evidence presently at hand does not support MSL's contention that one of the reasons the ABA declined to accredit MSL was noncompliance with the salary standard[]."  Id. at 458.  The court allowed MSL to continue discovery to ascertain whether salary was a factor in accreditation denial, but barred broader discovery as to the development and implementation of that standard.

MSL did find evidence that the ABA had data on its salaries (collected as part of general fact-finding about the school) and evidence that the ABA had warned other schools about low salaries.  Nevertheless, MSL is not able to point to any evidence, or draw a reasonable inference, that the ABA actually used salary as a factor in denying MSL's accreditation or that

15

the ABA's stated reasons for denying it accreditation were pretextual.  In fact, the evidence and inferences point the other way, demonstrating that the ABA explicitly states low salaries as a factor when it is one.  Thus, we cannot find that the district court's limitation of discovery in this manner was an abuse of discretion.

2.    Conspiracy

MSL argues that the district court denied it the discovery necessary to prove its allegations of conspiracy.  MSL complains generally about the lack of usefulness of the materials it did receive during discovery, but largely confines its argument to the materials the ABA turned over to the DOJ, some 544,000 pages.  MSL cites a number of cases, including Golden Quality Ice Cream Co. v. Deerfield Speciality Papers, Inc., 87 F.R.D. 53 (E.D. Pa. 1980), for the proposition that civil antitrust plaintiffs can obtain discovery of documents produced for government antitrust cases.  Br. at 37.  In these cases, however, the government case had begun before the civil case, and the civil plaintiffs sought copies of the material given to the government at the outset of discovery in their cases.  See Golden Quality, 87 F.R.D. at 59.[5]

In the present case, the government's investigation began after MSL's, and MSL sought all of the documents given to

_____

[5]    Further, these cases involved requests to stay the civil proceedings until the completion of the government investigation.  See, e.g., Golden Quality, 87 F.R.D. at 55.  Of course, we recognize that the government's case against the ABA was civil but we are using civil to mean a non-governmental case.

16

the government after the court set the confines of discovery in MSL's case. Thus, the district court held in an order dated August 6, 1996, that a request for all documents given to the government was an attempt "to do an end run around" the existing discovery framework. The court found that MSL could have obtained all those documents which were relevant through the existing discovery framework. See Board of Educ. of Evanston Township v. Admiral Heating and Ventilation, Inc., 513 F. Supp. 600, 603-04 (N.D. Ill. 1981) (denying complete turnover of all materials collected by grand jury investigation). Given the context of this case, the court did not abuse its discretion in this ruling.

MSL also argues that it was not given sufficient opportunity to conduct discovery to withstand the appellees' summary judgment motion. MSL cites several cases for the proposition that granting summary judgment before the opposing party has had sufficient opportunity for discovery can be reversible error. See, e.g., Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986); Mannington Mills, Inc. v. Congoleum Indus., Inc., 610 F.2d 1059, 1073 (3d Cir. 1979). Br. at 4. These cases are in tension with another line of cases which encourages the use of summary judgment in order to avoid burdensome litigation expenses when the allegations are theoretical or speculative. See, e.g., Pennsylvania ex. rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 182 (3d Cir. 1988); Pennsylvania Dental Ass'n v. Medical Serv. Ass'n, 745 F.2d 248, 262 (3d Cir. 1984). While the present case fits neither paradigm

17

exactly, the district court, by allowing fairly extensive discovery and then closing discovery and entertaining the summary judgment motion, did not abuse its discretion.

### C. Summary Judgment

MSL asserts three types of injury resulting from the ABA's allegedly anticompetitive conduct. The first is that MSL is at a competitive disadvantage in recruiting students because graduates of unaccredited schools cannot take the bar examination in most states. Second, MSL says that denial of accreditation creates a stigma, independent of the bar examination issue. Finally, MSL contends that the ABA's enforcement of its accreditation standards injures it directly by increasing the cost of faculty salaries and creating a boycott of unaccredited schools.

In granting summary judgment to the appellees, the district court held that they were not subject to antitrust liability for MSL's principal alleged injury, a competitive disadvantage in recruiting students, to the extent that the decisions of the individual states to prohibit graduates of unaccredited schools from taking their bar examinations caused the injury. MSL, 937 F. Supp. at 441. The court based this holding on the principles of Noerr, 365 U.S. 127, 81 S.Ct. 523. MSL argues on appeal that the Noerr principles do not apply here because private anti-competitive conduct is immunized only where it is (1) clearly and affirmatively authorized by state policy, and (2) actively supervised by the state. California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105,

18

100 S.Ct. 937, 943 (1980).  See also FTC v. Ticor Title Ins. Co.,
504 U.S. 621, 112 S.Ct. 2169 (1992); Patrick v. Burget, 486 U.S.
94, 108 S.Ct. 1658 (1988).  The DOJ, in its amicus brief, does
not challenge this aspect of the district court's holding.

In Parker v. Brown the Supreme Court held that the
Sherman Act does not prohibit an anticompetitive restraint
imposed by a state as an act of government.  317 U.S. 341, 352,
63 S.Ct. 307, 314 (1943).  The decision in Noerr reaffirmed the
Parker doctrine in stating "where a restraint upon trade or
monopolization is the result of valid governmental action, as
opposed to private action, no violation of the Act can be made
out."  365 U.S. at 136, 81 S.Ct. at 529.  Noerr went on to hold
that any attempt to petition or influence the government to
impose an anticompetitive restraint is immune from antitrust
action.[6]  Id.  Further, even if the anticompetitive restraint
results directly from private action, it is still immune if it is
an "incidental effect" of a legitimate attempt to influence
governmental action.  Id. at 143-44, 81 S.Ct. at 533.  As the
Supreme Court put it, "Parker and Noerr are complementary
expressions of the principle that the antitrust laws regulate
business, not politics; the former decision protects the States'
acts of governing, and the latter the citizens' participation in
government."  City of Columbia v. Omni Outdoor Advertising, Inc.,

6.    Noerr dealt specifically with legislative lobbying,
but its principles were applied to cover attempts to influence
the executive and judicial branches in United Mine Workers v.
Pennington, 381 U.S. 657, 85 S.Ct. 1585 (1965), and California
Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct.
609 (1972).

19

499 U.S. 365, 383, 111 S.Ct. 1344, 1355 (1991). Thus, the initial substantive issues on this appeal are whether state or private conduct caused the injury MSL alleges it suffered because its graduates could not take the bar examination in most states, and whether, if MSL suffered an injury as a result of the ABA's conduct, the injury was an incidental effect of the ABA's attempt to influence the states with respect to establishing criteria for bar admission. We will discuss each alleged injury separately.

1. Injury from bar examination requirements

Each state retains the authority to decide what applicants may take its bar examination and may be admitted to the bar.[7] Accordingly, MSL's argument that the ABA received "carte-blanche delegated authority to decide who can take bar exams," MSL reply br. at 19, is simply wrong. See cases cited supra note 7. Many, but not all, states consider the accreditation decisions of the ABA in their legal education requirement (one of many requirements) for taking the bar examination. Yet, every state retains the final authority to set

---

7. See, e.g., Hoover v. Ronwin, 466 U.S. 558, 569, 104 S.Ct. 1989, 1996 (1984) ("Pursuant to the State Constitution the Arizona Supreme Court has plenary authority to determine admissions to the bar."); In re Murphy, 393 A.2d 369, 371 (Pa. 1978) (bar admission "exercised [] exclusively by the Supreme Court"); In re Hansen, 275 N.W.2d 790, 796 (Minn. 1978) ("We have not delegated our authority to the ABA but, instead, have simply made a rational decision to follow the standards of educational excellence it has developed."); Potter v. New Jersey Supreme Court, 403 F. Supp. 1036, 1040 (D.N.J. 1975) (State's adoption of "the standards of an approving body does not support a conclusion that such adoption is an abrogation or delegation of the power or duty to supervise the practice of law in this State pursuant to the mandate of the State Constitution."), aff'd, 546 F.2d 418 (3d Cir. 1976).

all the bar admission rules, and individual applicants or law schools can petition the states for waivers or changes.

To the extent that MSL's alleged injury arises from the inability of its graduates to take the bar examination in most states, the injury is the result of state action and thus is immune from antitrust action under the doctrine of Parker v. Brown, 317 U.S. at 352, 63 S.Ct. at 314. The ABA does not decide who can take the bar examinations. Rather, it makes an accreditation decision which it conveys to the states, but the states make the decisions as to bar admissions. Without state action, the ABA's accreditation decisions would not affect state bar admissions requirements. Because the states are sovereign in imposing the bar admission requirements, the clear articulation and active supervision requirements urged by MSL are inapplicable. See Quinn v. Kent Gen. Hosp., Inc., 617 F. Supp. 1226, 1240 (D. Del. 1985). In short, this case does not involve a delegation of state authority. To the contrary, the states use the ABA to assist them in their decision-making processes. Thus, we have here a government action case.

Our holding is consistent with current antitrust jurisprudence. The Supreme Court held in a challenge to Arizona's bar admissions policies that the conduct in question "was in reality that of the Arizona Supreme Court," and thus immune under Parker. Hoover v. Ronwin, 466 U.S. 558, 573-74, 104 S.Ct. 1989, 1998 (1984). Further, the Supreme Court has held that when a state supreme court adopts a state bar rule banning legal advertising, and retains final enforcement authority over

it, Parker immunity applies. Bates v. State Bar of Arizona, 433 U.S. 350, 361, 97 S.Ct. 2691, 2697 (1977) ("The Arizona Supreme Court is the real party in interest; it adopted the rules, and it is the ultimate trier of fact and law in the enforcement process."). This case is entirely analogous. The states do not adopt the ABA's accreditation processes, but they do adopt and give effect to the results.[8] Thus, the cases cited by MSL (Midcal, Patrick, ant Ticor) are inapplicable because they dealt with situations where private parties were engaging in conduct, whether price-fixing (Midcal and Ticor) or denying hospital privileges (Patrick), which led directly to the alleged antitrust injury. Here, the state action setting the bar examination requirements led to the alleged injury.[9]

Our holding is also consistent with several court of appeals and district court decisions applying the principles of Noerr. In Lawline v. American Bar Ass'n, 956 F.2d 1378 (7th Cir. 1992), the Court of Appeals for the Seventh Circuit held under Noerr that the ABA could not be held liable for any antitrust injury resulting from the Illinois Supreme Court's adoption of ethical standards developed and promulgated by the ABA. Id. at

---

8.      The Supreme Court opinion in Allied Tube & Conduit Corp. v. Indian head, Inc, 486 U.S. 492, 108 S.Ct. 1931 (1988), is also consistent with our holding because it specifically excluded from consideration any injury resulting from the adoption of the challenged standards by any government and dealt only with the independent marketplace effect of the defendant's conduct. Id. at 500, 108 S.Ct. at 1937.

9.      In its reply brief, MSL continues to miss the crucial point that it is the direct action of the states which causes its injury and continues to discuss cases where private conduct caused the alleged antitrust injury. MSL reply br. at 11–15.

1383. Similarly, in Sessions Tank Liners, Inc. v. Joor Mfg., Inc., 17 F.3d 295, 299 (9th Cir. 1994), the Court of Appeals for the Ninth Circuit held that a defendant which convinced a private association to produce a code that was adopted by or relied upon by a number of municipalities, and that injured the plaintiff, was immune from antitrust liability because the "injuries for which [plaintiff] seeks recovery flowed directly from government action."[10] Id. at 299. These cases cannot be distinguished effectively from this case.

In another analogous case, an organization that accredited chiropractic schools was held immune from Sherman Act liability for denying a school's accreditation because of a dispute over educational philosophy, when the alleged injury resulted from state decisions to deny licenses to graduates of unaccredited schools and from the effects of lobbying in favor of those state decisions. Sherman College of Straight Chiropractic v. American Chiropractic Ass'n, 654 F. Supp. 716, 722–23 (N.D. Ga. 1986), aff'd, 813 F.2d 349 (11th Cir. 1987). See also Zavaletta v. American Bar Ass'n, 721 F. Supp. 96 (E.D. Va. 1989) (dismissing suit by students at unaccredited law school because of Noerr immunity). In these circumstances, MSL's claim that the ABA's conduct injured it because its graduates cannot take the bar examination in most states fails.

2. Stigma injury

---

10.    In Sessions, the injury resulted from the denial of permits, while here the injury is from the prohibition precluding applicants from taking bar examinations in many states.

23

MSL also alleges that independent of any bar examination requirements, it was injured by the stigmatic effect in the market place of the denial of accreditation. MSL claims that the ABA has conducted a campaign to convey the idea that ABA accreditation is the *sine qua non* of quality and that the ABA is the most, or only, competent organization to judge law schools. There is enough evidence to create a genuine dispute of material fact on this issue. See app. at 2105-09, 3570-72. Nevertheless, the district court ruled that this injury could not form the basis for antitrust liability because it was "incidental to the primary, protected injury," and thus immune under Noerr. MSL, 937 F. Supp. at 442. MSL challenges this holding on the grounds that there was no petitioning of government here, and therefore Noerr does not apply. The DOJ as amicus challenges the holding to the extent it finds petitioning unnecessary for immunity for stigma injury, but takes no position on whether any petitioning took place. We hold that there was sufficient petitioning to invoke Noerr immunity.[11]

MSL relies extensively on the Supreme Court's decision in Allied Tube & Conduit Corp. v. Indian Head, Inc, 486 U.S. 492,

---

11. In its reply brief, MSL seriously misstates the Noerr doctrine, arguing that only "successful petitioning of courts to clearly and affirmatively authorize . . . closely supervise, review and approve" the ABA's conduct would provide immunity. MSL reply br. at 19. Under Noerr, any solicitation of government action is immune, whether or not it is successful. This mischaracterization stems from MSL's continued inability to recognize that there is state action at issue here, not private conduct.

108 S.Ct. 1931 (1988).[12]  In _Allied Tube_, a producer of electrical conduit sought approval of its product from the National Fire Protection Association for inclusion of the product in the Association's National Electrical Code.  A substantial number of state and local governments adopted the code virtually without change.  To be included in the code, all that was required was a majority vote of the members present at the annual meeting of the Association.  To prevent approval of the electrical conduit at question in the case, competitors of the producer stacked the annual meeting with persons who pledged to vote against approval.  On the facts in _Allied Tube_ the Court held that the code developed by the defendants had a force in the marketplace independent of any government adoption (or petitioning for such adoption) in that there was a conspiracy among manufacturers, distributors, and consumers not to trade in products not approved by the code.  486 U.S. at 503, 507, 108 S.Ct. at 1938-40.   Further, the Court held that the application of _Noerr_ immunity depends "on the context and nature of the . . . activity," and found the challenged conduct to be "the type of commercial activity that has traditionally had its validity determined by the antitrust laws."  486 U.S. at 504-05, 108 S.Ct. at 1939.  That was so, the Court reasoned, because the activity

_____

12.    MSL's additional reliance on _American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp._, 456 U.S. 556, 102 S.Ct. 1935 (1982), is misplaced because that case dealt with agency and apparent authority issues and does not consider _Parker_ or _Noerr_ immunity.  It also dealt with an attempt to interfere directly with a company's customers, 456 U.S. at 562, 102 S.Ct. at 1940, an exception to _Noerr_ inapplicable here.

of which the producer complained involved the dubious commercial practices of economically interested actors that had an impact on the political process; it was not political activity that had an impact on commerce.

The conduct of which MSL complains here is basically the ABA's justification of its accreditation decisions and MSL is asserting a loss of prestige resulting from it. This conduct is neither normal commercial activity nor the type of restraint of trade involved in Allied Tube, and thus that case is not controlling. A loss of prestige resulting from a refusal to approve a product or service does not alone make out an antitrust claim. See Schachar v. American Academy of Ophthalmology, Inc., 870 F.2d 397, 399 (7th Cir. 1989); Consolidated Metal Prods., Inc. v. American Petroleum Inst., 846 F.2d 284, 293 (5th Cir. 1988).

Noerr immunity is proper in this case because the ABA engaged in petitioning activity, and the stigma injury which MSL suffered was incidental to that activity.[13] MSL admits that in the past, "from the 1920's to approximately the mid 1970's," the ABA petitioned the states in a campaign to prohibit graduates from unaccredited schools from taking bar examinations. See MSL br. at 16. This campaign was obviously successful as now most states require graduation from an ABA-accredited school for admission to the bar. The ABA's current conduct surely would be considered petitioning if it took place during the past campaign.

13. There is no "conspiracy" exception to either Noerr or Parker immunity. Omni, 499 U.S. at 383, 111 S.Ct. at 1355.

26

The fact that the ABA was successful in lobbying the states does not weaken its position. The ABA continues to communicate its accreditation decisions to the states, and it desires that they continue to give them credence. Discussing the quality and competence of its decisions is a legitimate, although somewhat indirect, way of petitioning the states to continue to follow its guidance. Yet, such activity is no more indirect than the public relations campaign held to be petitioning in Noerr. 365 U.S. at 140-41, 81 S.Ct. at 531.

There is an exception to Noerr immunity that would apply if the ABA "attempted directly to persuade anyone not to deal with" MSL. See Noerr, 365 U.S. at 142, 81 S.Ct. at 532. There is no evidence that the ABA made such an attempt (there was such evidence in Allied Tube), nor is there any other evidence suggesting that Noerr immunity should not apply here. In a supplemental filing of information after oral argument, MSL produced two instances where it claims the ABA directly mentioned MSL. The first is a Boston Globe article about the denial of accreditation to MSL in which an ABA governor defended the ABA standards as providing "a minimum level of quality and consumer protection assurance to the public." John H. Kennedy, "Andover Law School Loses Appeal for Accreditation," Boston Globe, February 9, 1994, at 42. The second proffered piece of evidence is a transcript of the ABA House of Delegates debate of MSL's accreditation application, where one member urged the denial of MSL's application and stated that the standards with which MSL did not comply "lie at the heart of a quality institution."

Both of these statements do nothing more than defend the ABA standards. As we discuss above, this is valid, if indirect, petitioning activity. The ABA is not saying directly that MSL is a bad institution, or that a particular student should not go there. MSL's attempts to characterize all the ABA's comments about the quality of its accreditation process as direct attacks on MSL does not make them direct attacks. We also point out that if a claim for stigma injury could be advanced in circumstances like those here, Noerr immunity would be confined severely; a petitioner for governmental action is likely to urge that the action is needed to ensure that standards are met, thereby suggesting that some entities do not meet appropriate standards.

3. Direct injury from ABA standards

MSL alleges a third injury which occurs directly from the ABA's enforcement of its standards, independent of both the bar examination and stigma issues. The challenged standards relate to faculty salaries (MSL charges price-fixing) and limitations on accredited schools accepting transfers or graduate students from unaccredited schools (MSL charges a boycott). Although the ABA is immune from liability attributable to the state action in requiring applicants for the bar examination to have graduated from an ABA-accredited law school and from any stigma injury resulting from the denial of accreditation under the Noerr petitioning doctrine, the ABA is not immune in the actual enforcement of its standards. The state action relates to the use of the results of the accreditation process, not the

process itself.  The process is entirely private conduct which has not been approved or supervised explicitly by any state.  See Midcal, 445 U.S. 97, 100 S.Ct. 937.  Thus, the ABA's enforcement of an anticompetitive standard which injures MSL would not be immune from possible antitrust liability.  Extending Noerr immunity to this type of private activity would run counter to Allied Tube.

We start our analysis of this direct injury issue by pointing out that "to survive [] motion for summary judgment, [the plaintiff] must establish that there is a genuine issue of material fact as to whether [the defendants] entered into an illegal conspiracy that caused [the plaintiff] to suffer a cognizable injury." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S.Ct. 1348, 1355 (1986).  The district court held that MSL did not raise a genuine issue of fact as to whether it was injured by the salary, transfer or graduate student standards.  MSL, 937 F. Supp. at 441 n.10, 445 n.20.

As we discuss above, MSL failed to show sufficient evidence that it was denied accreditation because it did not comply with the salary standard.  Therefore, MSL has to show that the ABA's alleged fixing of salaries at its accredited schools somehow injured it in another way.  At first glance, the argument that the ABA's faculty salary standards injured MSL makes no economic sense.  As the district court commented, if ABA-accredited schools are required to pay higher salaries, an unaccredited school should have a cost advantage.  See MSL, 937

29

F. Supp. at 441 n.10. Indeed, it would appear that a conspiracy to increase the conspirators' costs would be no more logical than would a conspiracy to reduce the conspirators' income. Cf. Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1195–1204 (3d Cir. 1995) (discussing predatory pricing monopoly case). Thus, while we consider this appeal on ordinary summary judgment standards, we point out that it could be argued that MSL "must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Matushita, 475 U.S. at 587, 106 S.Ct. at 1356.

MSL alleges that the faculty salary standards injured it in two ways. First, MSL asserts that it raised its salaries in an attempt to get accreditation. This claim is in direct conflict to its consistent assertion that it refused to comply with the ABA's anticompetitive standards and for that reason was denied accreditation. See, e.g., MSL br. at 3–4. The claim also is remarkable because MSL made it clear that it would not comply with ABA standards to obtain certification. Further, MSL's assistant dean testified that MSL salaries have "never been tied to" ABA standards.[14] App. at 439. Rather, its dean stated that the salary increases were made out of fairness and as a reward for hard work. App. at 393. The only other related evidence shows that MSL acted independently to increase its salaries, and then later found that this action might help it get

---

14. MSL points out that the assistant dean has no role in setting MSL's salaries, so he is only giving his personal belief on the issue. MSL reply br. at 30, sup. app. at 5476–79.

30

accreditation.  See app. at 828.  Unsupported allegations to the

contrary, see app. at 2123, are not sufficient without

explanation to outweigh the prior testimony and avoid summary

judgment.  See Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir.

1991); Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3d

Cir. 1988); but see Videon Chevrolet, Inc. v. General Motors

Corp., 992 F.2d 482, 488 (3d Cir. 1993) (distinguishing Martin

and holding that statements have to be clearly contradictory and

without explanation to be insufficient to defeat summary judgment

motion).  There has not been sufficient explanation of the

contradiction to create a genuine issue of material fact and

justify reversing the summary judgment.

MSL's second contention that the ABA's salary standards

injured it is that the standards inflated the market cost of law

professors, thereby increasing the salaries MSL must pay its

faculty.  This market price argument is equally unavailing.

MSL's stated policy was to rely on adjunct faculty.  MSL did not

produce evidence that any of its faculty other than its dean ever

had been employed at another law school.  In effect, MSL was

hiring faculty from a different market, one unaffected by the

ABA's conduct, or at least a different provider in the same

market (teachers who never taught at ABA-accredited schools).

The report by MSL's economic expert does not contradict this

point, app. at 3568, because it contains only general and

theoretical observations and is not tied to evidence in the

31

record.[15]  Thus, we can disregard it for the purposes of reviewing the summary judgment.  See Pennsylvania Dental Ass'n v. Medical Serv. Ass'n, 745 F.2d 248, 262 (3d Cir. 1984).  Our result is supported by MSL's policy towards salaries: "because a professor at MSL must prove himself or herself as a full-time faculty member before obtaining a large salary, MSL retained a level of starting salaries that are below ABA requirements."  App. at 2123.[16]

The situation here is analogous to that in Mid-West Paper Prods. Co. v. Continental Group, Inc., 596 F.2d 573 (3d Cir. 1979).  In that case we held that a purchaser from competitors of a price-fixer did not have standing to sue the price-fixer on the grounds that the general market price increased as a result of the price fixing.  Id. at 587.  We explained Mid-West Paper in In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1167-68 (3d Cir. 1993), where we focused on how direct an impact the challenged conduct had on the

15.    "[A]s I understand it, MSL was forced to raise its salaries to levels above what it would have otherwise (a) in an attempt to satisfy the standards and (b) because of the market effects of the standards on prices in the input markets.  The anticompetitive effects of those practices affect input prices (salaries, etc.) for MSL, as well for every other law school.  The practices injure all of the schools that have accepted the standards, as well as those that have not.  Because the standards have an undeniable impact on input costs, every school is forced to incur higher costs, along with the reduction in the flexibility needed to respond efficiently to changing conditions, all schools suffer competitive injury as well."  App. at 3568.

16.    It is interesting to note that MSL charges that the ABA and the AALS engaged in a conspiracy to restrain trade.  It thus appears that insofar as the salary standards are concerned, MSL believes that the AALS conspired to increase its member law schools' costs.

32

plaintiff. MSL was not impacted directly by the ABA's criteria because it was hiring a different kind of professor. Mid-West Paper thus controls, and summary judgment was proper.[17]

MSL also alleges a boycott in that the ABA prevented its accredited schools from accepting transfers or graduate students from unaccredited schools. The district court held that MSL had not produced any evidence that it was injured by either of these rules. MSL, 937 F. Supp. at 445 n.20. This holding is correct. MSL has done nothing more than state the standards and allege that they injured MSL. See app. at 2108, 2120. There is no factual support for these allegations. Further, the evidence shows that MSL actively opposed its students transferring, both in policy and practice.[18] MSL therefore cannot claim that the ABA's prohibition on transfers with credit injured it.[19]

---

17.  This is true even though Mid-West Paper dealt with standing and we deal here with whether there is a genuine issue of fact as to MSL's injury, for the concepts are similar.

18.  Its dean testified in another proceeding "MSL would have [] denied admission had it known [a student] intended to seek transfer away as soon as possible." App. at 1415. MSL considered transfers to be "extremely harmful to the school," id. at 1416, and that assisting students in transferring was "self-destructive." Id. at 1231.

19.  MSL's reliance on the allegations in the government's antitrust case which we described above is unavailing for two reasons. First, those allegations never were proven because the case was settled, and therefore cannot be taken as true in this case. See United States v. Microsoft Corp., 56 F.3d 1448, 1460-61 (D.C. Cir. 1995); Petruzzi's IGA v. Darling-Delaware, 998 F.2d at 1247. Second, the government never alleged that MSL suffered any injury from these standards and does not so argue in its amicus brief in this case. See, e.g., DOJ br. at 6-7.

MSL also alleges that the AALS boycotted MSL by refusing membership and that the LSAC boycotted MSL by refusing to allow it to attend certain recruiting conferences. See MSL br. at 59. The allegations regarding the AALS are simply incorrect. AALS membership is independent of ABA accreditation, and MSL never has applied for such membership. App. at 2278-80. Even though it is not a member, MSL can attend AALS conferences and has done so. Id. at 2280. Therefore MSL has not suffered any injury at the hands of the AALS.

The LSAC's failure to invite MSL to its conferences does not constitute a boycott.[20] Under the fact-pattern here to demonstrate a boycott, MSL has to show that these conferences are an essential facility for recruiting students as there is no other potential basis for the boycott claim. Such an essential facility or claim fails whenever a plaintiff (1) cannot show that the defendant has a monopoly over the alleged essential facility; (2) the facility cannot be duplicated in a reasonable manner; and (3) the plaintiff has been denied its use. Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 748 (3d Cir. 1996). MSL has shown only that the LSAC denies it participation. There is no evidence suggesting that the LSAC has a monopoly over access to law students or pre-law advisors, or even over recruiting fairs. The LSAC does not hinder MSL's recruiting in any way, it

_____

20. LSAC conferences are only open to LSAC member schools. MSL is not a member of the LSAC because it does not use the LSAT and it is not accredited by either the ABA or the AALS.

just does not aid it by allowing MSL to attend its conferences.[21] Such activity is not required by the antitrust laws, and its absence does not constitute antitrust injury.

Further, MSL has not shown that the LSAC injured it. The LSAC never allowed MSL to attend its conferences and, prior to ABA accreditation denial, MSL's enrollment exceeded its projections. App. at 2420-24. It was the denial of accreditation which caused MSL's enrollment to decline, and as discussed above, in light of Parker and Noerr that loss cannot be the basis for antitrust liability. MSL contends that as long as it was injured in some way by the overall alleged conspiracy, it need not show injury from its individual aspects, and cites in this respect In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d at 1172. Reply br. at 35. While this principle is correct, it is inapplicable here. In re Lower Lake Erie did not involve state action or petitioning of government immunity issues. Here, MSL must show that it was injured in some way by the ABA's enforcement of its standards, independent of any injury from the immune state action or petitioning, and as we discuss above, it has not done so.

Inasmuch as we hold that MSL has failed to demonstrate an injury for which antitrust liability may lie, we need go no further to affirm the district court's summary judgment order with respect to issues beyond those controlled by Parker and

---

21. Similarly, MSL's claims about getting only a listing in The Official Guide to U.S. Law Schools fail because there are many such publications, some of which do describe MSL.

Noerr.  Thus, we do not consider the district court's alternative free speech immunity theory.  Further, we make no comment on whether MSL produced sufficient evidence to show the existence of a conspiracy for two reasons.[22]  First, the alleged conspiracy with respect to the injuries from the bar examination requirements and the stigma from denial of accreditation involved immunized conduct.  See Omni, 499 U.S. at 381-84, 111 S.Ct. at 1354-56.  Second, MSL did not demonstrate that it suffered injury from the conduct not immunized.  15 U.S.C. § 15; see Matsushita, 475 U.S. at 585-86, 106 S.Ct. at 1355; Mathews v. Lancaster Gen. Hosp., 87 F.3d at 641; see also Sciambra v. Graham News, 892 F.2d 411, 414-15 (5th Cir. 1996); United States Football League v. National Football League, 842 F.2d 1335, 1377-78 (2d Cir. 1988).  Of course, we hasten to add that we do not hold that if MSL had been able to demonstrate injury from conduct beyond the scope of Parker and Noerr antitrust immunity there necessarily would be liability as we have no need to reach that point.

### D.  Dismissal of the Individual Appellees

The district court dismissed claims against the 22 individual appellees for lack of personal jurisdiction in the Eastern District of Pennsylvania in an order on March 11, 1994.  MSL, 846 F. Supp. 374 (E.D. Pa. 1994).  The court, upon reconsideration and after MSL had conducted some discovery, found on May 31, 1994, that MSL could not "suggest, much less show,

---

22.   We do note, however, that there is no probative evidence that the AALS or LSAC was involved in any kind of conspiracy with the ABA.

substantial acts in Pennsylvania." MSL, 853 F. Supp. 843, 845 (E.D. Pa. 1994). MSL challenges the dismissal on the grounds that it was entered before MSL was allowed to undertake any discovery as to the appellees' contacts within the district.

Our rule is generally that jurisdictional discovery should be allowed unless the plaintiff's claim is "clearly frivolous." Nehemiah v. The Athletics Congress, 765 F.2d 42, 48 (3d Cir. 1985), citing Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances, 723 F.2d 357, 362 (3d Cir. 1983). The district court found (at least by implication), and we agree, that MSL's jurisdictional claims were clearly frivolous. Our result is in accord with other cases which hold that a mere unsupported allegation that the defendant "transacts business" in an area is "clearly frivolous." See Garshman v. Universal Resources Holding, Inc., 641 F. Supp. 1359, 1366 (D.N.J. 1986), aff'd on other grounds, 824 F.2d 223 (3d Cir. 1987);[23] see also American Centennial Ins. Co. v. Handal, 901 F. Supp. 892, 899 (D.N.J. 1995). MSL legitimately cannot allege a nationwide conspiracy and then say, without more evidence, that such a conspiracy must have effects in Pennsylvania.

Further, jurisdictional discovery generally relates to corporate defendants and the question of whether they are "doing business" in the state. See Compagnie Des Bauxites, 723 F.2d at 362 and cases cited therein. Where the defendant is an

_____

23. Garshman was decided on venue grounds, but the analysis is the same as for personal jurisdiction. Garshman, 641 F. Supp. at 1366.

individual, the presumption in favor of discovery is reduced. See Shaw v. Boyd, 658 F. Supp. 89, 91 n.1 (E.D. Pa. 1987). Thus, the district court's order dismissing the individual appellees without ordering discovery first was correct.[24]

### E. Recusal of Judge Ditter

MSL made several attempts to have Judge Ditter recused. Judge Ditter denied MSL's recusal motion in an opinion dated December 16, 1994. MSL, 872 F. Supp. 1346 (E.D. Pa. 1994). MSL's attempts to seek his recusal in this court were also unavailing (one denied, one held moot in light of this appeal). Inasmuch as we are affirming the summary judgment, we need not consider arguments regarding reassignment on remand. We review the denial of the recusal motion for abuse of discretion.

MSL argues that Judge Ditter has both the appearance of bias and actual bias, and should be removed from the case under either 28 U.S.C. § 455(a) or this court's authority as recognized in Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 167 (3d Cir. 1993), and Haines v. Liggett Group, Inc., 975 F.2d 81, 98 (3d Cir. 1992). The standard for recusal is whether an objective observer reasonably might question the judge's impartiality. MSL contends that both one past out-of-court experience, and the bias which it asserts is apparent from his rulings, justify Judge Ditter's recusal.

---

24. We note that in view of our merits disposition we can conceive of no way that the individual appellees could be liable in this case.

38

MSL argues that Judge Ditter's participation in 1974-75 on an outside committee which tried to help the Delaware Law School, where his son was then a student, obtain ABA accreditation justifies recusal. In over 200 pages of documents submitted by MSL relating to Delaware Law School (gleaned from depositions and testimony before several courts), Judge Ditter's name appears only six times. This evidence suggests nothing more than that Judge Ditter had several meetings with the person who was the driving force behind the effort to make changes at Delaware Law School in order to qualify for accreditation. There is one affidavit from the former dean of that school that suggests that Judge Ditter played a more active role, but Judge Ditter, in his careful consideration of the recusal motion, sufficiently points out the inconsistencies between this declaration and other more contemporaneous testimony. See MSL, 872 F. Supp. 1346, 1358-65 (E.D. Pa. 1994). We thus affirm Judge Ditter's holding that nothing related to Delaware Law School creates an appearance of bias in this case. This is true both because of Judge Ditter's limited role at the time and the amount of time which has passed. This view is in accord with the prevailing case law. See, e.g., In re Allied Signal, Inc., 891 F.2d 974, 976 (1st Cir. 1989) (upholding denial of recusal motion based on social and business relationship eight years earlier between judge and one of plaintiff's attorneys); Alexander v. Chicago Park Dist., 773 F.2d 850, 857 (7th Cir. 1985) (denying recusal motion based on judge's representation of witness 25 years earlier).

Furthermore, we do not understand why Judge Ditter's participation in the Delaware Law School accreditation process, no matter how intensive, would cause an objective observer to believe that he would not be impartial here. The Delaware Law School and MSL situations, though somewhat similar in nature, are unrelated. Indeed, it is difficult even to articulate a reasonable basis on which to argue that by reason of Judge Ditter's experiences regarding the Delaware Law School he would have a bias here. As far as we can see, there is no more basis to think that Judge Ditter was not impartial here because of his experiences 20 years ago with Delaware Law School, than to believe that a judge who had been in an automobile accident would not be impartial in a case involving a different accident.

MSL also argues that Judge Ditter's rulings, both in substance (allegedly always against MSL) and in form (allegedly repeatedly vilifying and condemning MSL and its dean), demonstrate actual bias. Since we have affirmed several of the rulings MSL contends demonstrate bias, and a review of the record shows that there was no pattern of consistently ruling against MSL, there is no actual bias.

We also point out that a judge's consistent pattern of ruling against a party could be entirely justified for that party might consistently be taking positions that cannot be supported. Even-handed justice does not require a judge to balance numerically the rulings in favor of and against each party. After all, each ruling stands on its own. Furthermore, the Supreme Court has said that "judicial rulings alone almost never

40

constitute a valid basis for a bias or partiality motion."
Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157
(1994).[25]  We do not believe that a reasonable person who looked
at Judge Ditter's rulings objectively would find the appearance
of bias.  See United States v. Bertoli, 40 F.3d 1384, 1413 (3d
Cir. 1994).  It should be apparent to anyone that he worked
diligently in this hard-fought case and, as far as we are
concerned, reached the correct outcome.

We also do not find that any of Judge Ditter's comments
cited by MSL, see MSL br. at 23-25, suggest the appearance of
partiality.  The Liteky Court held that "judicial remarks during
the course of a trial that are critical or disapproving of, or
even hostile to, counsel, the parties, or their cases, ordinarily
do not support a bias or partiality challenge."  510 U.S. at 555,
114 S.Ct. at 1157; see also In re Skobinsky, 167 B.R. 45, 52
(E.D. Pa. 1994).  MSL's desire to impute hostile intent to Judge
Ditter does not mean he had that intent, and does not create an
appearance of bias.  MSL's attitude appears to be that anyone who
disagrees with it is both wrong and biased, but the evidence does
not show this.  The cases cited by MSL are inapplicable because
they dealt with unique extrajudicial contact with a party, In re
Sch. Asbestos Litig., 977 F.2d 764 (3d Cir. 1992), an implicit
admission of bias by the judge, In re Antar, 71 F.3d 97, 101 (3d
Cir. 1995), or reassignment on remand, Haines and Alexander.
Since this case will not be remanded, we need not consider

25.    The holding in Liteky required bias to stem from an
"extrajudicial source" to support a recusal under section 455(a).

41

reassignment and, as we discussed, Judge Ditter's denial of the recusal motion was not an abuse of discretion.

### F.  Disqualification of Inside Counsel

MSL also appeals the district court's disqualification of five members of MSL's administration and faculty from serving as trial counsel, giving oral argument, and taking depositions.[26] Since MSL does not allege that it received incompetent counsel, and we are affirming the summary judgment order, the issue probably is moot.  In any event, the court did not err in requiring the disqualification.

### III. CONCLUSION

The order of the district court entered August 29, 1996, granting the appellees summary judgment and the other orders on appeal will be affirmed.

––––––––––

---

26.    By agreement among the parties, this order later was modified to allow two of the MSL professors to act as trial counsel.  MSL br. at 29 n.12.