<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 UNITED STATES COURT OF APPEALS
                     FOR THE FIRST CIRCUIT
                   _________________________

No. 97-1926

         MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC.,
                     Plaintiff, Appellant,

                               v.

               AMERICAN BAR ASSOCIATION, ET AL.,
                     Defendants, Appellees.
                   _________________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

      [Hon. Morris E. Lasker, Senior U.S. District Judge]
                   _________________________

                             Before

                     Selya, Circuit Judge,
                Campbell, Senior Circuit Judge,
                   and Boudin, Circuit Judge.
                   _________________________

    Michael L. Coyne, with whom Peter M. Malaguti was on brief,
for appellant.
    Joseph L. Kociubes, with whom Peter J. Mancusi, Bingham, Dana
LLP, David T. Pritikin, David R. Stewart, Sidley & Austin, Darryl
L. DePriest, and Catherine A. Daubard were on brief, for appellees
American Bar Association and affiliated individuals.
    Vincent M. Amoroso, with whom Peabody & Arnold, Robert A.
Burgoyne, and Fulbright & Jaworski L.L.P. were on brief, for
appellee Association of American Law Schools.
    James R. DeGiacomo, with whom Judith K. Wyman and Roche,
Carens & DeGiacomo, P.C. were on brief, for appellee New England
School of Law.

                   _________________________

                        April 24, 1998

                   _________________________

         SELYA, Circuit Judge.  The lawsuit that undergirds this
appeal pits a fledgling law school, built on a foundation of
unconventional premises, against the legal establishment.  The
gargantuan record, capable of inducing tapephobia in even the
hardiest appellate panel, is forbidding, but sheer bulk rarely is
an accurate proxy for complexity.  Having scaled the mountain of
papers and obtained a clear view of the legal landscape, we
conclude that the lower court correctly apprehended both the issues
and the answers.  Consequently, we uphold the several rulings that
the appellant so vigorously contests.
I.  THE PROTAGONISTS
         In late 1995, Massachusetts School of Law (MSL) sued the
American Bar Association (the ABA), the American Association of Law
Schools (the AALS), New England School of Law (NESL), and fourteen
individual defendants.  The facts that inform MSL's wide-ranging
allegations are too diffuse to shed much light at this juncture, so
we leave them shuttered until they can illuminate the specific
issues raised by this appeal.  We deem it helpful, however, to
describe at the outset the institutions and individuals involved in
the litigation.
         We begin with MSL, a non-profit institution that opened
its doors in 1988.  The school's self-proclaimed mission is to
provide high-quality, affordable legal education to capable persons
who traditionally have been shut out of the legal profession,
including members of disadvantaged demographic populations and
persons turning to the law in search of a second career.  To this
end, MSL does not require applicants to take the Law School
Aptitude Test (LSAT) because it considers the test biased.  
Moreover, MSL's curriculum features a higher-than-usual percentage
of adjunct instructors and a concentrated focus on professional
skills courses.  MSL is not a fully accredited law school, but in
1990, the Massachusetts Board of Regents authorized the school to
award the J.D. degree and thereby enabled MSL graduates to sit for
the Massachusetts bar.
         The ABA is the largest national organization of the legal
profession.  It has a membership of more than 380,000, composed
principally of practicing lawyers (including lawyers in government
and corporate America), judges, court administrators, and legal
educators.  Though the ABA does not have the power to discipline
lawyers, it promulgates model rules, develops guidelines, and
strives to function as the national voice of the legal profession.  
In that capacity, it long has served as the chief accreditor of law
schools.
         The AALS is a non-profit association of 160 law schools.  
Its stated objective is "the improvement of the legal profession
through legal education."  It serves as a trade organization for
law professors and, with reference to legal education, acts as the
academy's principal representative to the federal government and to
national higher education organizations.  The AALS is separate from
the ABA, but the two informally interlock in various ways.  Many
individuals are active in both organizations and many AALS members
participate in the ABA accreditation process.
         The fourteen individual defendants divide into two
groups.  One group (the Eight Individual Defendants) comprises the
seven members of the ABA's Accreditation Committee (the Committee)
plus the immediate past chair of the ABA's Section of Legal
Education and Admissions to the Bar (the Section).  The other group
(the Six Individual Defendants) comprises the five members of the
ABA team that visited MSL during its unsuccessful effort to obtain
accreditation, plus a consultant who advised the ABA during that
process.  All fourteen individual defendants are active
participants in accreditation-related matters.
         NESL is an ABA-accredited law school located in Boston,
Massachusetts.  MSL regards itself as a competitor of NESL   and
one which, if accredited, would be all the more formidable.
II.  THE ACCREDITATION PROCESS
         For more than 70 years, the ABA has promulgated the
standards for law school accreditation (the Standards).  It is
widely believed among legal educators and regulatory organizations
that compliance with the Standards enhances the quality of legal
education.  MSL disputes this conventional wisdom but, since 1952,
the United States Department of Education (the DOE) has recognized
the ABA as a "reliable authority" anent the quality of legal
education and has designated it as the relevant accrediting body.  
20 U.S.C.  1099b(a).  As a result of this recognition, ABA-
accredited schools are eligible to participate in federal  student
loan programs.  See 20 U.S.C.  1141(a)(5).  Accredited
institutions also receive various state-based benefits, not the
least of which is that all fifty states, the District of Columbia,
and the Commonwealth of Puerto Rico deem graduation from an ABA-
accredited institution sufficient to satisfy the legal education
requirement for admission to the bar.
         The accreditation process works something like this.  A
law school may apply for ABA accreditation after three years of
operation.  Its application must include a self-study, delineating
its perception of its present and projected compliance with the
Standards and explaining any deviations from them.  The Committee
reviews each application and appoints a site-visit team  to conduct
interviews and inspect the applicant's physical plant.  This team
reports its findings to the Committee.  If the Committee determines
that the school is in compliance with the Standards, the
accreditation process moves forward.  If a school is found not to
be in compliance with the Standards, the Committee nonetheless may
recommend provisional accreditation if it receives satisfactory
assurances that the applicant will achieve compliance within three
years.  See Standard 104(a).
         In the absence of compliance (actual or anticipated),
there is another potential route to accreditation:  the applicant
may request a variance from the Standards, and the body that
oversees the accreditation process, the Council of the Section (the
Council), may choose to grant it as a matter of discretion.  
Standard 802 governs the variance procedure.  Because this Standard
is central to MSL's accreditation effort, we reprint it in full:
         A law school proposing to offer a program of
         legal education contrary to the terms of the
         Standards may apply to the Council for a
         variance.  The variance may be granted if the
         Council finds that the proposal is consistent
         with the general purpose of the Standards.  
         The Council may impose such conditions or
         qualifications as it deems appropriate.

III.  MSL'S ACCREDITATION EFFORT
         MSL applied for ABA accreditation in 1992.  From the
outset, MSL recognized that its practices were discordant with the
Standards, yet remained steadfast in its deliberately contrarian
mission.  At no time did MSL argue present compliance with the
Standards or promise future compliance.  Instead, it confessed in
its self-study that "[t]o the considerable extent MSL's goals and
methods are innovative, sometimes they deliberately run counter to
conventional ABA criteria of accreditation."  Not surprisingly, MSL
invoked Standard 802 by letter dated January 27, 1993, and
requested "a waiver of each and every Standard that . . . might bar
accreditation" on the ground that, despite its admitted lack of
conformity, "MSL provides a high quality legal education that meets
the underlying objectives of the accreditation process."
         An ABA team visited MSL's campus in April 1993.  The next
month, the site-visit team recommended that the Committee deny
accreditation because MSL was in default of myriad Standards.  The
Committee accepted the recommendation and rejected the application.  
MSL successively appealed to the Council and to the ABA's House of
Delegates, both of which upheld the denial of accreditation.
IV.  PROCEDURAL HISTORY
         Although the instant litigation has all the hurly-burly
of a major engagement, it is in point of fact a rear-guard action.  
In November 1993, MSL brought an antitrust suit against the ABA,
the AALS, and twenty-one individual defendants (including twelve of
the fourteen persons sued here) in the United States District Court
for the Eastern District of Pennsylvania.  The Third Circuit
subsequently characterized MSL's complaint as alleging that the
named defendants conspired "to enforce the ABA's anticompetitive
accreditation standards [and thus violated the Sherman Act] by:  
(1) fixing the price of faculty salaries; (2) requiring reduced
teaching hours and non-teaching duties; (3) requiring paid
sabbaticals; (4) forcing the hiring of more professors in order to
lower student/faculty ratios; (5) limiting the use of adjunct
professors; (6) prohibiting the use of required or for-credit bar
review courses; (7) forcing schools to limit the number of hours
students could work; (8) prohibiting ABA-accredited schools from
accepting credit transfers from unaccredited schools and from
enrolling graduates of unaccredited schools in graduate programs;
(9) requiring more expensive and elaborate physical and library
facilities; and (10) requiring schools to use the LSAT."  
Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n,
107 F.3d 1026, 1031-32 (3d Cir.) (MSL I), cert. denied, 118 S. Ct.
264 (1997).  Between 1994 and 1996, the district court published no
fewer than nine opinions.  At the end of the line, the district
court entered summary judgment in favor of all remaining defendants
(including the ABA and the AALS), and the Third Circuit affirmed.  
See id.  
         With the antitrust case still extant,  MSL sought to try
its luck in the Massachusetts state courts.  Its suit named the
ABA, the AALS, twelve of the same individuals whom it had sued in
MSL I, and three virgin defendants (NESL and two additional
Committee members, Moeser and Yu).  MSL's complaint asserts claims
for violation of Mass. Gen. Laws ch. 93A and for tortious
misrepresentation against all the defendants, as well as claims for
fraud, deceit, civil conspiracy, and breach of contract against the
AALS, the ABA, and the fourteen named individuals.  The strand that
sews together this tapestry of charges is MSL's accusation that the
ABA and the AALS for many years have banded together to monopolize
legal education with a goal of increasing their institutional power
and boosting the salaries of law professors and administrators.  
MSL asserts that its educational philosophy poses a threat to the
ABA/AALS cabal and that the two organizations therefore conspired
to deny MSL accreditation, despite the fact that MSL's educational
offerings are exemplary.
         Invoking 20 U.S.C.  1099b(f), discussed infra Part V,
the defendants removed the case to the United States District Court
for the District of Massachusetts.  The district court denied MSL's
timely motion to remand.  After a full year's worth of pretrial
skirmishing, the court methodically dismembered MSL's complaint,
defendant by defendant, during a four month period in 1997:  on
January 10, it granted NESL's motion to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6); on February 13, it granted the Eight Individual
Defendants' motion to dismiss for lack of personal jurisdiction; on
March 3, it granted the AALS's motion for summary judgment; and on
May 8, it granted summary judgment in favor of the ABA and the Six
Individual Defendants.  MSL appeals from each of these rulings.
         We first address two threshold jurisdictional issues:  
the refusal to remand and the court's holding that it lacked
jurisdiction over the Eight Individual Defendants.  From that point
forward, we proceed on a defendant-by-defendant basis.
V.  THE MOTION TO REMAND
         The court below denied MSL's motion to remand, ruling
that the suit arose under federal law.  See 28 U.S.C.  1331
(1994); see also Viqueira v. First Bank, ___ F.3d ___, ___ (1st
Cir. 1998) [No. 97-2127, slip. op. at 8-13] (discussing federal
question jurisdiction).  Judge Lasker premised this holding on 20
U.S.C.  1099b(f), which provides in pertinent part:
         Notwithstanding any other provision of law,
         any civil action brought by an institution of
         higher education seeking accreditation from,
         or accredited by, an accrediting agency or
         association approved by the Secretary . . .
         and involving the denial, withdrawal, or
         termination of accreditation of the
         institution of higher education, shall be
         brought in the appropriate United States
         district court.

We review the denial of a motion to remand de novo and place the
burden of persuasion upon the party who insists that federal
jurisdiction obtains.  See BIW Deceived v. Local S6, 132 F.3d 824,
831 (1st Cir. 1997).
         We appear to be the first appellate court to address this
seldom-used removal statute.  The statutory language is
straightforward and the provision's meaning clear:  if a civil
action brought by an institution of higher education involves a
denial of accreditation, then federal jurisdiction exists.  MSL, by
self-characterization, is an institution of higher education, and
the ABA's withholding of accreditation is the cynosure of its suit.  
Thus, to the extent that MSL alleges harms within the accreditation
process   and such allegations permeate its complaint   section
1099b(f) applies.
         The only colorable issue that MSL raises with regard to
remand implicates the constitutionality of section 1099b(f).  This,
too, is a question of first impression.  For a case properly to
"aris[e] under" federal law, 28 U.S.C.  1331, Congress must confer
federal jurisdiction in the context of a broad statutory framework
within an area susceptible to congressional regulation.  In other
words, the jurisdictional grant must be "simply one part of [a]
comprehensive scheme."  Verlinden B. V. v. Central Bank of Nigeria,
461 U.S. 480, 496 (1983).  MSL contends that section 1099b(f) fails
this test and that Article III does not permit Congress to confer
federal jurisdiction by means of such a freewheeling jurisdictional
statute.  See, e.g., The Propellor Genesee Chief v. Fitzhugh, 53
U.S. (12 How.) 443, 452 (1851); Mossman v. Higginson, 4 U.S. (4
Dall.) 12, 13 (1800) (per curiam).
         The focus of our inquiry thus becomes whether section
1099b(f)'s grant of jurisdiction occurs within a sufficiently
comprehensive regulatory scheme.  We answer this question
affirmatively.  Accreditation serves an important national function
because once an institution of higher education becomes accredited
by the DOE or its designated accrediting agency, the institution
becomes eligible for federal student loan monies.  See Chicago Sch.
of Automatic Transmissions, Inc. v. Accreditation Alliance of
Career Schs. & Colleges, 44 F.3d 447, 449 (7th Cir. 1994).  The
Higher Education Act and the DOE's implementing regulations spin a
sophisticated regulatory web that governs the relationship between
accrediting agencies and accreditation applicants.  See, e.g., 34
C.F.R.  602.24, 602.28 (1996) (requiring that accrediting agencies
apply consistent standards and give applicants due process).  The
grant of federal jurisdiction over matters involving accreditation
is reasonably related to the efficient operation of that system.  
No more is exigible.
         To summarize, section 1099b(f)'s grant of federal
jurisdiction occurs within a broad statutory framework, properly
the subject of congressional concern.  Accordingly, the statute
comports with Article III.  Removal was altogether appropriate.
VI.  THE EIGHT INDIVIDUAL DEFENDANTS
         When the district court applies the prima facie standard
and grants a motion to dismiss for want of in personam jurisdiction
without conducting an evidentiary hearing to resolve disputed
jurisdictional facts, the court of appeals reviews its ruling de
novo.  See Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d
138, 147 (1st Cir. 1995).  The lower court's decision to dismiss
MSL's action as to the Committee members   defendants Hasl, Moeser,
Ryan, Schneider, Sowle, Walwer, and Yu   falls within this sphere.  
So does the order dismissing the action against the last of the
Eight Individual Defendants, Henry Ramsey, Jr. (the chair of the
Section).  Withal, Ramsey's situation requires a more extended
analysis.
         The factual basis for MSL's jurisdictional initiative
derives predominantly from three events that occurred in 1993.  
According to the complaint, Hasl, Moeser, Schneider, and Ramsey met
in Boston on February 6.  The quartet allegedly "used false
statements and charges"   the nature of which is not disclosed   in
order "to try to bring their plan of non-accreditation of MSL to
fruition."  A review of the parties' proffers reveals, however,
that the only MSL-related business transacted at this meeting
involved a decision to delay the site visit by one month.  MSL next
alludes to a Committee meeting that took place on June 23 in
Brooklyn, New York.  The Eight Individual Defendants all attended
this session and participated in the denial of MSL's application
for accreditation.  The Eight Individual Defendants, save Ramsey,
also attended a retreat that took place on Nantucket Island, in
Massachusetts, from June 24-27.  MSL asserts conclusorily that the
Committee "finalized" the denial of its application during this
period, but the record flatly contradicts this assertion:  the
retreat participants all maintain (to quote from typical language
appearing in their several affidavits) that "[w]hile in Nantucket,
the Committee did not take up any agenda item concerning MSL, as
all matters concerning MSL had been concluded in Brooklyn, New
York, on June 23, 1993."  MSL proffers no clear evidence showing
that these statements are inaccurate.
         On a motion to dismiss for want of in personamjurisdiction, Fed. R. Civ. P. 12(b)(2), the plaintiff ultimately
bears the burden of persuading the court that jurisdiction exists.  
See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189
(1936); Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st
Cir. 1997).  In conducting the requisite analysis under the prima
facie standard, we take specific facts affirmatively alleged by the
plaintiff as true (whether or not disputed) and construe them in
the light most congenial to the plaintiff's jurisdictional claim.  
See Ticketmaster, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).  
We then add to the mix facts put forward by the defendants, to the
extent that they are uncontradicted.  See, e.g., Topp v. Compair
Inc., 814 F.2d 830, 836-37 (1st Cir. 1987).  We caution that,
despite the liberality of this approach, the law does not require
us struthiously to "credit conclusory allegations or draw
farfetched inferences."  Ticketmaster-N.Y., 26 F.3d at 203.
         A district court may exercise authority over a defendant
by virtue of either general or specific jurisdiction.  SeeDonatelli v. National Hockey League, 893 F.2d 459,  462-63 (1st
Cir. 1990).  General jurisdiction "exists when the litigation is
not directly founded on the defendant's forum-based contacts, but
the defendant has nevertheless engaged in continuous and systematic
activity, unrelated to the suit, in the forum state."  United
Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d
1080, 1088 (1st Cir. 1992).  MSL does not argue, and we find no
facts to suggest, that any of the Eight Individual Defendants can
be brought before a Massachusetts court on a general jurisdiction
theory.
         In the absence of general jurisdiction, a court's power
depends upon the existence of specific jurisdiction.  Specific
jurisdiction exists when there is a demonstrable nexus between a
plaintiff's claims and a defendant's forum-based activities, such
as when the litigation itself is founded directly on those
activities.  See Donatelli, 893 F.2d at 462.  In this instance, MSL
asserts specific jurisdiction under Mass. Gen. L. ch. 223A.  3
(1992).  MSL cites variously to section 3(a), which extends
"personal jurisdiction over a person, who acts directly or by an
agent, as to a cause of action in law or equity arising from the
person's . . . transacting any business" in Massachusetts, and to
section 3(c), which authorizes personal jurisdiction over a non-
resident who causes "tortious injury" by an "act or omission in
this Commonwealth."
         We need not pause to consider the particulars of the
Massachusetts long-arm statute.  Even if that statute, correctly
applied, would purport to grant jurisdiction over the Eight
Individual Defendants   a matter of state law on which we take no
view   MSL still would have to demonstrate that "the exercise of
jurisdiction pursuant to that statute comports with the strictures
of the Constitution."  Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir.
1994).  In the personal jurisdiction context, we have characterized
compliance with the Constitution as implicating "three distinct
components, namely, relatedness, purposeful availment (sometimes
called 'minimum contacts'), and reasonableness."  Foster-Miller, 46
F.3d at 144.  We analyze the situations of the Eight Individuals
Defendants through this prism.
         In order for the extension of personal jurisdiction to
survive constitutional scrutiny, a claim must "arise out of, or be
related to, the defendant's in-forum activities."  Ticketmaster-
N.Y., 26 F.3d at 206.  We have approached the relatedness inquiry
with slightly different emphases when the plaintiff asserts a
contract claim then when she asserts a tort claim:  if a contract
claim, our stereotypical inquiry tends to ask whether the
defendant's forum-based activities are "instrumental in the
formation of the contract," Hahn v. Vermont Law Sch., 698 F.2d 48,
51 (1st Cir. 1983); if a tort claim, we customarily look to whether
the plaintiff has established "cause in fact (i.e., the injury
would not have occurred 'but for' the defendant's forum-state
activity) and legal cause (i.e., the defendant's in-state conduct
gave birth to the cause of action)."  United Elec., Radio & Mach.
Workers, 960 F.2d at 1089; see also Ticketmaster-N.Y., 26 F.3d at
207 (noting that the relatedness inquiry is intended in part to
"ensure[] that the element of causation remains in the forefront of
the due process investigation").  In respect to the Eight
Individual Defendants, MSL presents only tort claims before us,
and thus our relatedness analysis thus focuses on causation.  We
find this element clearly lacking as regards the seven Committee
members.
    The only activities undertaken in Massachusetts by any of
these seven persons that possibly could relate to MSL's state-law
claims consists of the participation of three of them in the Boston
meeting and the attendance of all seven at the Nantucket retreat.  
MSL's insinuations notwithstanding, the particularized facts that
were before the district court show conclusively that both of these
activities were benign:  the Boston meeting dealt with MSL in a
purely peripheral sense (doing no more than to delay the site visit
to MSL's facility by one month), and the retreat did not deal with
MSL at all.
    MSL also argues that two letters written to it by James
White, an ABA consultant, are sufficient to extend personal
jurisdiction over the Eight Individual Defendants.  One of these
communiques informed MSL of the Committee's decision not to grant
MSL provisional approval; contemporaneous copies were sent by White
to the seven Committee members.  The other letter informed MSL of
the Council's decision to reject its application for a variance
pursuant to Standard 802 and to deny its accreditation appeal.  
Contemporaneous copies of this letter were sent to defendants Hasl,
Moeser, and Ramsey.
    These missives do not carry weight in the jurisdictional
calculus vis--vis the Eight Individual Defendants.  We cannot
subscribe to a transitive view of minimum contacts, which would
hold that a letter from A to B that reports on C's actions confers
personal jurisdiction over C in B's home state based on those
actions.  Without a more substantial nexus, the extension of such
jurisdiction would violate due process, for the connection between
C's actions in an extra-forum jurisdiction and B's home state is
too attenuated to satisfy the relatedness requirement.  SeeHelicoperos Nacionales de Colombia v. Hall, 466 U.S. 408, 417
(1984).  Nor do we think that the case for the application of such
a novel rule is bolstered by the mere fact that A (acting, for
aught that appears, on his own initiative) chooses to inform C of
his communication with B by mailing her a copy of it.
    Although MSL does not assert in so many words that the
Committee's denial of accreditation at the Brooklyn meeting
constitutes conduct directed into Massachusetts sufficient to
bestow personal jurisdiction, it intimates as much.  We therefore
address this possibility.  The transmission of facts or information
into Massachusetts via telephone or mail would of course constitute
evidence of a jurisdictional contact directed into the forum state,
see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985), but
we must determine whether the Committee's decision to deny
accreditation   a decision that had effects in Massachusetts   
qualifies as such a contact.
    We have wrestled before with this issue of whether the
in-forum effects of extra-forum activities suffice to constitute
minimum contacts and have found in the negative.  For example, in
Sawtelle v. Farrell, 70 F.3d 1381 (1st Cir. 1995), we recounted
Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7 (1st
Cir. 1986), and noted that in Kowalski "we rejected the plaintiff's
contention that, because the 'effects' of the firm's negligence
were felt in New Hampshire, the law firm had caused an injury there
by conduct directed at that forum."  Sawtelle, 70 F.3d at 1390.  
Just as the New Hampshire effects of Massachusetts negligence,
without more, could not sustain an action in New Hampshire against
the negligent actor, see Kowalski, 787 F.2d at 11, so too the
Massachusetts effects of the Eight Individual Defendants' New York
actions, without more, fail to sustain an action in a Massachusetts
court.  Accord Sawtelle, 70 F.3d at 1394 (holding that New
Hampshire effects of non-forum negligence, without more, are
insufficient to support personal jurisdiction).
    Ramsey is in a slightly different position.  Although
what we have just discussed pertains to him   after all, he
participated in both the Boston and Brooklyn meetings   it is not
conclusive because the record reflects that, unlike his seven
cohorts, he had other contacts which might suffice to clear the
relatedness hurdle.  Ramsey wrote a memorandum to White that
memorialized a conversation between Ramsey and MSL's Dean Velvel.  
Ramsey reported that during this conversation Velvel attempted to
couple MSL's effort to obtain waivers under Standard 802 with MSL's
plan to persuade the DOE to jettison the ABA as the national
accrediting agency for law schools.  The memorandum itself
indicates that Ramsey sent a copy to Velvel, presumably at MSL, and
the inclusion of Velvel's Andover telephone number indicates that
Velvel was in Massachusetts when he and Ramsey spoke.  Although the
contents of this memorandum hardly flatter MSL, the memorandum
constitutes some indication that Ramsey engaged in conduct that
might bear upon the relatedness inquiry.
    Because of our doubts about the outcome of the
relatedness inquiry vis--vis Ramsey, we turn to the question of
whether Ramsey's contacts with Massachusetts "represent a
purposeful availment of the privilege of conducting activities in
[Massachusetts], thereby invoking the benefits and protections of
[its] laws and making the defendant's involuntary presence before
[the Massachusetts] court foreseeable."  Pritzker, 42 F.3d at 61
(internal quotation marks and citation omitted).
    Even though the record suggests that Ramsey participated
in a telephone call with Dean Velvel concerning MSL's accreditation
while Velvel was in Massachusetts, it is uninformative as to who
initiated the call.  In either case, we believe that this solitary
telephone conversation and the subsequent mailing of a copy of
Ramsey's memorandum, even when combined with Ramsey's participation
in the Boston meeting, are insufficient to establish purposeful
availment.  See, e.g., Aylward v. Fleet Bank, 122 F.3d 616, 618
(8th Cir. 1997) (holding that three telephone calls and one letter
within a seven month period were insufficient to support the
exercise of personal jurisdiction when the alleged injury did not
arise directly from the contacts); U.S.S. Yachts, Inc. v. Ocean
Yachts, Inc., 894 F.2d 9, 11 (1st Cir. 1990) (holding that three
letters sent to Puerto Rico were insufficient to support the
exercise of personal jurisdiction in that venue).  Put another way,
based on these exiguous contacts Ramsey could not reasonably have
foreseen being haled into a Massachusetts court to answer
allegations of a wide-ranging conspiracy.  We therefore conclude
that the extension of personal jurisdiction to him would violate
his due process rights.
    In a last-ditch effort to stem the tide, MSL laments that
it did not have the opportunity to engage in jurisdictional
discovery.  The docket contains no evidence, however, that MSL ever
made a motion or other documented request for jurisdictional
discovery in the district court.  Therefore, in accordance with
firmly settled principles, we will not entertain its plaint now.  
See Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962, 964-
65 (1st Cir. 1997).
    We have said enough on this score.  Because MSL neither
alleged nor proffered sufficient facts to permit the exercise of
jurisdiction over the Eight Individual Defendants, the district
court did not err when it granted their motion to dismiss.  SeeFed. R. Civ. P. 12(b)(2).
VII.  THE ABA AND THE AALS
    The ABA and the AALS each present multiple grounds in
support of the district court's grant of summary judgment.  The
most striking of these is the defense of res judicata.  In its
present iteration, this defense turns on whether the judgment
entered in the previous litigation between the parties (MSL I) bars
the plaintiff from maintaining the instant action against these two
institutional defendants.  
    Where, as here, both the potentially precluding suit and
the potentially precluded suit were litigated in federal courts,
federal law governs the res judicata effect of the prior judgment.  
See Gonzalez v. Banco Central Corp., 27 F.3d 751, 755 (1st Cir.
1994).  The elements of federal res judicata are "(1) a final
judgment on the merits in an earlier suit, (2) sufficient
identicality between the causes of action asserted in the earlier
and later suits, and (3) sufficient identicality between the
parties in the two suits."  Id.  In this instance, the first and
third tines of the test are foregone conclusions.  Because the
Supreme Court denied certiorari after the Third Circuit affirmed
the district court's entry of final judgment in MSL I, the finality
of the earlier judgment cannot be gainsaid.  By like token, MSL,
the ABA, and the AALS were parties to the precursor litigation and
thus satisfy the identicality requirement.  The question, then, is
whether the state-law claims that MSL now advances against the ABA
and the AALS are sufficiently related to the causes of action
asserted in MSL I to warrant claim preclusion.
    We begin with bedrock.  To bring claim preclusion into
play, a cause of action need not be a clone of the earlier cause of
action.  "Under res judicata, a final judgment on the merits of an
action precludes the parties or their privies from relitigating
issues that were or could have been raised in that action."  Allenv. McCurry, 449 U.S. 90, 94 (1980).  We have adopted a
transactional approach to determine whether causes of action are
sufficiently related to support a res judicata defense.  See Kalev. Combined Ins. Co., 924 F.2d 1161, 1166 (1st Cir. 1991).  "Under
this approach, a cause of action is defined as a set of facts which
can be characterized as a single transaction or series of related
transactions."  Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.,
48 F.3d 576, 583 (1st Cir. 1995).  This boils down to whether the
causes of action arise out of a common nucleus of operative facts.  
See Gonzalez, 27 F.3d at 755.  In mounting this inquiry, we
routinely ask "whether the facts are related in time, space,
origin, or motivation, whether they form a convenient trial unit,
and whether their treatment as a unit conforms to the parties'
expectations."  Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 6
(1st Cir. 1992) (quoting Restatement (Second) of Judgments  24
(1982)).
    These principles are dispositive here.  MSL's pending
claims, though rooted in Massachusetts law, plainly arise from the
same set of operative facts as its earlier antitrust claims.  
Although MSL describes the later claims more colloquially and
dresses them in different legal raiment, the conduct that
underbraces the two sets of claims is strikingly similar in time,
space, origin, and motivation.  Both suits stem from MSL's failed
efforts in 1992 and 1993 to receive ABA accreditation.  In both
cases, MSL alleges that the ABA and the AALS orchestrated a long-
term scheme to accumulate power and money and a short-term scheme
to deny accreditation unjustly to MSL because MSL dared to oppose
their hegemony.
    In addition to their common heritage, the two suits also
are compatible in a practical sense.  It is  settled "that where
the witnesses or proof needed in the second action overlap
substantially with those used in the first action, the second
action should ordinarily be precluded."  Porn v. National Grange
Mut. Ins. Co., 93 F.3d 31, 36 (1st Cir. 1996).  Because neither
MSL's antitrust claims nor its state-law claims survived summary
disposition, we must make an informed prophecy as to what witnesses
would have appeared and what proof would have emerged had the two
cases been tried.  Here, the two suits' factual underpinnings are
the same.  This unmistakable congruence strongly suggests that the
same witnesses   largely ABA, AALS, and MSL personnel   and
information   the evolution of the ABA accreditation procedures and
the details of the MSL accreditation effort   would have been
necessary to resolve both cases.  This substantial imbrication
makes it apparent that the two cases would have formed a convenient
trial unit and argues powerfully for claim preclusion.  See id. at
34; see also King v. Uncon Oil Co., 117 F.3d 443, 445 (10th Cir.
1997).
    To the extent that reasonable expectations, objectively
assayed, enter into the res judicata calculus, they augur here
toward the same conclusion.  In the first place, since the two sets
of claims arise in the same time frame out of similar facts, "one
would reasonably expect them to be brought together," Porn, 93 F.3d
at 37.  In the second place, a party may be more readily presumed
to expect that a court will treat multiple causes of action as a
single trial unit when the plaintiff has all the facts necessary to
bring the second claim at its disposal before or during the
pendency of the first.  MSL does not identify any significant facts
that were not within its ken  before the antitrust action reached
its climax.  We therefore conclude that the application of res
judicata is an entirely predictable consequence of MSL's unilateral
decision to split its claim.
    Of course, res judicata will not attach if the claim
asserted in the second suit could not have been asserted in the
first.  See In re Newport Harbor Assocs., 589 F.2d 20, 24 (1st Cir.
1978).  In an effort to avoid looming defeat, MSL tries to squeeze
through this loophole by questioning whether it could have brought
the instant claims in the Eastern District of Pennsylvania.  
Insofar as this question relates to MSL's pursuit of the ABA and
the AALS, it is easily answered.
    Under 28 U.S.C.  1367(a), a federal court that exercises
federal question jurisdiction over a claim may also assert
supplemental jurisdiction over all state-law claims that arise from
the same operative facts.  See BIW Deceived, 132 F.3d at 833;
Rodriguez v. Doral Mortgage Co., 57 F.3d 1168, 1175 (1st Cir.
1995).  As we already have determined, the facts upon which MSL
grounded its antitrust action concern MSL's efforts to receive ABA
accreditation between 1992 and 1993.  This same trove of facts also
provides the basis for MSL's state-law claims against the ABA and
the AALS.  As a result, had MSL ventured to bring its current
compendium of claims before the Pennsylvania federal district court
as part and parcel of MSL I, that court could have entertained them
in conjunction with the antitrust action then before it.  See 28
U.S.C.  1367.
    Despite the fact that the Court has ceded the federal
judiciary broad leeway to "look to the common law or to the
policies supporting res judicata . . . in assessing the preclusive
effect of decisions of other federal courts," Allen, 449 U.S. at
96, MSL makes one last effort to undercut the district court's
determination.  Res judicata cannot be applied against a plaintiff
unless the plaintiff had a full and fair opportunity to litigate
all its claims in the original action.  See id. at 90; Kale, 924
F.2d at 1168. Citing a series of adverse discovery rulings, MSL
argues that it did not receive such an opportunity in the Eastern
District of Pennsylvania.
    The Court has not yet addressed the standard for
determining the existence vel non of a full and fair opportunity in
regard to a prior federal judgment.  The standard, however, is
quite permissive as it pertains to prior state court judgments.  To
meet this standard, a state court judgment need only "satisfy the
minimal procedural requirements of the Fourteenth Amendment's Due
Process Clause."  Kremer v. Chemical Constr. Corp., 456 U.S. 461,
481 (1982).  We do not envision a significantly less latitudinarian
test for federal court judgments.  We hold, therefore, that as long
as a prior federal court judgment is procured in a manner that
satisfies due process concerns, the requisite "full and fair
opportunity" existed.
    Here, MSL points to its numerous failed efforts to obtain
additional discovery in the Eastern District of Pennsylvania and
asseverates that draconian restrictions deprived it of an adequate
chance to litigate its claims in MSL I.  These allegations of
discovery error are reheated for our consumption.  They previously
were reviewed and rejected by the Third Circuit, see MSL I, 107
F.3d at 1033-34, and we see no reason to revisit that
determination.
    At any rate, a full and fair opportunity to litigate
cannot be equated with a license to do as a party pleases.  The
adjudicative process operates pursuant to rules, and an opportunity
to litigate is no less "full" or "fair" simply because the forum
court enforces conventional limitations on pretrial discovery.  By
any conceivable criterion, MSL had its full and fair opportunity to
assert, in the Pennsylvania proceeding, the panoply of procedural
and substantive rights guaranteed it by federal law.  Its first
action therefore furnishes a proper predicate for the application
of res judicata in its second action.
    In this instance, all roads lead to Rome.  MSL had an
appropriate opportunity to litigate its first set of claims, and
conveniently could have brought the second set as part of the same
proceeding.  Its failure to do so dooms the instant action since
MSL's two sets of allegations arise from a common nucleus of
operative facts and fit together tongue and groove.  We conclude
that, as a consequence of this road not taken, res judicata
precludes MSL's state-law claims against the ABA and the AALS.  
Accordingly, we affirm the district court's grant of summary
judgment in favor of these two institutional defendants.
VIII.  NEW ENGLAND SCHOOL OF LAW
    The district court granted NESL's motion to dismiss,
ruling that the complaint failed to state a claim against NESL upon
which relief could be granted.  See Fed. R. Civ. P. 12(b)(6).  We
review this determination de novo, accept all well-pleaded facts as
true, and draw all reasonable inferences in favor of the plaintiff.  
See Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st
Cir. 1989).  Notwithstanding the generous contours of this
standard, a reviewing court need not "swallow plaintiff's invective
hook, line, and sinker; bald assertions unsupportable conclusions,
periphrastic circumlocutions, and the like need not be credited."  
Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).
    MSL's briefing reads as if it were seeking to hold NESL
liable for civil conspiracy.  Nevertheless, its complaint aims the
conspiracy charge elsewhere and the sufficiency of a complaint
ordinarily should be tested by examining the claims that are stated
therein rather than by weighing afterthought claims that are only
mentioned in a legal brief.  See Beddall v. State St. Bank & Trust
Co., ___ F.3d ___, ___ (1st Cir. 1998) [No. 97-1666, slip op. at
20-21]; Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996);
Litton Indus., Inc. v. Colon, 587 F.2d 70, 74 (1st Cir. 1978).  As
MSL's complaint does not level a conspiracy charge against NESL, we
limit our inquiry to the claims that MSL saw fit to plead.
    MSL's complaint asserts two causes of action against
NESL:  tortious misrepresentation and violations of the
Massachusetts statute governing unfair and deceptive trade
practices (commonly known as Chapter 93A).  The complaint
predicates these causes of action on an exchange of correspondence
between NESL officials (specifically, James Lawton, the chair of
NESL's board of trustees, and Ellen Wayne, NESL's placement
director) and the ABA's consultant, James White.  We catalog these
four pieces of correspondence.
    Lawton wrote to White on January 2, 1990, stating in
pertinent part:
         The chairman of the Massachusetts Board
    of Regents is former U.S. Senator Paul Tsongas
    and he is for all intents and purposes the
    "principal" in the Massachusetts School of Law
    at Andover.  Mr. Tsongas has the solid support
    of the Boston Globe and the Board of Regents
    are under his complete control at this time.
         My guess is that any other, new or
    competing law schools, which may come into
    existence will not receive support from the
    Regents who are a rigidly controlled group of
    Dukakis loyalists who will only do what they
    are told by the present administration under
    Tsongas and [Governor] Dukakis.

    Later that year, Wayne informed White that Massachusetts
authorities had authorized MSL to award J.D. degrees, and that its
graduates henceforth could sit for the Massachusetts bar.  This
missive, dated June 19, 1990, also mentioned that MSL had requested
and received a table at a fair sponsored by the Northeast
Association of Pre-Law Advisors (NAPLA).  Wayne reported that
NAPLA's by-laws had compelled approval of MSL's request, but that
the NAPLA board of directors would amend the by-laws to restrict
participation in subsequent programs to "ABA approved law
school[s]."  The complaint does not allege that NAPLA excluded MSL
from any subsequent events.
    Eight days later, White wrote to Lawton and solicited his
opinion as to the possibility of convincing the Massachusetts
Supreme Judicial Court (SJC) to amend its rules and require
graduation from an ABA-accredited law school as a prerequisite to
taking the Massachusetts bar examination.  Lawton's response, dated
July 17, 1990, indicated his approbation and recommended that
members of the bar petition for such an amendment.  The complaint
does not allege that such a request was ever made or that the SJC
revised its rules in the desired manner.
    The first letter from Lawton to White is plainly
inaccurate insofar as it proclaims a Tsongas/MSL connection.  
Senator Tsongas, who had ties to a different unaccredited law
school, had none with MSL.  MSL does not assert that the first
letter contains any other inaccuracies and does not point to any
misstatements in the remaining three epistles.
    Against this mise-en-scne, we turn to MSL's claim of
tortious misrepresentation.  This strikes us as something of a
misnomer (our canvass of Massachusetts case law does not reveal a
single articulation of the elements of a particularized cause of
action for tortious misrepresentation), but in all events,
Massachusetts jurisprudence recognizes causes of action for both
fraudulent misrepresentation and negligent misrepresentation.  See,
e.g., Craig v. Everett M. Brooks Co., 222 N.E.2d 752, 753 (Mass.
1967) (fraudulent misrepresentation); NYCAL Corp. v. KPMG Peat
Marwick, 688 N.E.2d 1368, 1371 (Mass. 1998) (negligent
misrepresentation).  MSL's complaint does not plead this claim with
sufficient particularity to support a charge of fraud, see Fed.
R. Civ. P. 9(b), and thus, we interpret the complaint as an attempt
to articulate a claim for negligent misrepresentation.  The
elements of such a cause of action are that the defendant falsely
represented a past or existing material fact without any reasonable
basis for thinking it to be true; that he intended to euchre the
plaintiff into relying on the representation; that the plaintiff,
unaware of the representation's falsity, justifiably relied on it;
and that the plaintiff suffered harm due to his reliance.  See 37
Am. Jur. 2d, Fraud and Deceit  12 (1968).
    The claim deserves short shrift.  To be sure, the
comments about Senator Tsongas amount to a misrepresentation, but
MSL does not plead that it relied on that misrepresentation to its
detriment, and such reliance cannot plausibly be inferred from the
complaint's other averments.  The general rule is that, without
this necessary element, there can be no recovery for negligent
misrepresentation under Massachusetts law.  See Romanoff v. Balcom,
339 N.E.2d 927, 927 (Mass. App. Ct. 1976).
    There is an exception to this rule.  In the absence of
detrimental reliance, a party still may be held liable under
Massachusetts law for misrepresentation of information negligently
supplied for the guidance of others.  See  Fox v. F & J Gattozzi
Corp., 672 N.E.2d 547, 551 (Mass. App. Ct. 1996) (stating that if
a defendant "in the course of his business . . . supplies false
information for the guidance of others in their business
transactions," he "is subject to liability for pecuniary loss
caused to [third persons] by [the recipient's] justifiable reliance
upon the information, if he fails to exercise reasonable care or
competence in obtaining or communicating the information") (quoting
Restatement (Second) Torts  552(a) (1977)).
    MSL's claim for tortious misrepresentation fails to
qualify for this exception.  Even if we assume that Lawton's first
letter to White occurred in the course of a "business transaction"
 a fact that MSL does not allege   MSL pleads neither that it (or
anyone else, for that matter) relied upon Lawton's faux pas nor
that it suffered any harm as a result of the transmittal of the
Tsongas-related (mis)information.  Hence, the district court did
not err in granting NESL's motion to dismiss the tortious
misrepresentation count.
    We next engage MSL's Chapter 93A claim for "unfair and
deceptive acts."  Mass. Gen. Laws ch. 93A,  2.  By their nature,
Chapter 93A claims tend to be case-specific.  Their general meter,
however, is that the defendant's conduct must be not only wrong,
but also egregiously wrong   and this standard calls for
determinations of egregiousness well beyond what is required for
most common law claims.  See Whitinsville Plaza, Inc. v. Kotseas,
390 N.E.2d 243, 251 (Mass. 1979).  To quote a by-now-familiar
formulation, "the objectionable conduct must attain a level of
rascality that would raise an eyebrow of someone inured to the
rough and tumble of the world of commerce."  Levings v. Forbes &
Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979).
    MSL's complaint is inscrutable as to the precise nature
of its Chapter 93A claim and its briefing is not very helpful on
this score.  Its complaint attributes nothing to NESL beyond the
latter's role in the exchange of correspondence described above.  
MSL apparently means to asseverate that publication of the
statements contained in the exchange of correspondence defamed or
otherwise damaged it and thus transgressed Chapter 93A.  This
asseveration cannot survive scrutiny.
    The SJC recently has held that "where allegedly
defamatory statements do not support a cause of action for
defamation, they also do not support a cause of action under
[Chapter] 93A."  Dulgarian v. Stone, 652 N.E.2d 603, 609 (Mass.
1995).  Truth is an absolute defense to a defamation action under
Massachusetts law, see Bander v. Metropolitan Life Ins. Co., 47
N.E.2d 595, 598 (Mass. 1943), and MSL therefore must demonstrate
that NESL published "a false and defamatory written communication
of and concerning the plaintiff."  McAvoy v. Shufrin, 518 N.E.2d
513, 517 (Mass. 1988).  As previously noted, the only false
statement ascribed to any NESL representative concerns Senator
Tsongas's alleged patronage of MSL.
    We next consider if that statement can form the basis for
a claim of defamation by MSL.  Whether a statement is reasonably
susceptible of a defamatory meaning is a question of law for the
court.  See Foley v. Lowell Sun Pub. Co., 533 N.E.2d 196, 197
(Mass. 1989).  For a communication to qualify as defamatory, "[t]he
test is, whether, in the circumstances, the writing discredits the
plaintiff in the minds of any considerable and respectable class in
the community."  Smith v. Suburban Restaurants, Inc., 373 N.E.2d
215, 217 (Mass. 1978).  The core question, therefore, is not
whether Lawton's demonstrated falsehood discredits somebody   it
plainly denigrates the late senator   but whether it significantly
discredits MSL.  See New Eng. Tractor-Trailer Training, Inc. v.
Globe Newspaper Co., 480 N.E.2d 1005, 1007 (Mass. 1985).
    In our estimation, the misstatement contained in Lawton's
January 2 letter does not sink to this level.  The senator enjoyed
an enviable reputation as a public servant of the highest
integrity.  MSL has failed utterly to suggest how any educational
institution could be defamed by attributing to it a connection with
him.  Absent such a link, no action lies.  See, e.g., Schwanbeck v.
Federal-Mogul Corp., 578 N.E.2d 789, 804 (Mass. App. Ct. 1991)
(explaining that false statements must have adverse consequences
for a plaintiff in order to be actionable under Chapter 93A).  
Thus, the Tsongas-related comment, though untrue, is not defamatory
of and concerning MSL.
    Nor does MSL's complaint allege any other cognizable
basis for Chapter 93A liability on NESL's part.  The four items of
correspondence hint that NESL did not wish MSL well, but none of
the matters which its representatives discussed with White suggest
activities so scurrilous as to trigger liability under Chapter 93A.  
Although we understand that a Chapter 93A violation need not rest
on an independent common law tort, see Massachusetts Farm Bureau
Fed'n, Inc. v. Blue Cross, Inc., 532 N.E.2d 660, 664 (Mass. 1989),
the conduct must at least come within shouting distance of some
established concept of unfairness.  See Gooley v. Mobil Oil Corp.,
851 F.2d 513, 515-16 (1st Cir. 1988).
    To sum up, even if Lawton and Wayne, on NESL's behalf,
participated in activities of the kind adumbrated by their
correspondence, such activities, though hostile to MSL and inimical
to its interests, are not "so seriously deceptive and harmful" as
to permit recovery under Chapter 93A.  Zayre Corp. v. Computer Sys.
of Am., Inc., 511 N.E.2d 23, 30 n.23 (Mass. App. Ct. 1987).  
Indeed, NESL's suspected (but unproven and unalleged) "actions"   
e.g., asking NAPLA to amend its by-laws or petitioning the SJC to
revise its rules   do not abridge any legal duty or bedrock concept
of unfairness, and are not so "unethical, oppressive, or
unscrupulous" as to be actionable under Chapter 93A.  PMP Assocs.,
Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)
(citation and internal quotation marks omitted).  What is more, MSL
fails to allege how NESL's involvement in these activities actually
caused any cognizable economic harm to it.  In itself, this is a
fatal flaw.  See Zayre Corp., 511 N.E.2d at 30; see also Mass. Gen.
Laws ch. 93A,  11 (explaining that, in a Chapter 93A claim, the
complainant must show that she "suffer[ed] a loss of money or
property, real or personal, as a result of the use . . . of an
unfair method of competition or an unfair or deceptive act or
practice").
    That ends the matter.  Because MSL has not advanced any  
sound basis on which NESL could be held liable either for negligent
misrepresentation or for transgressing Chapter 93A, we uphold Judge
Lasker's order granting NESL's motion to dismiss.
IX.  THE SIX INDIVIDUAL DEFENDANTS
    We need not linger long over MSL's claims against the Six
Individual Defendants.  This sextet comprises the ABA's consultant
(White), plus the five members of the site-visit team (Garcia-
Pedrosa, Nahstoll, Smith, Strickland, and Winograd).  Judge Lasker
dismissed MSL's breach of contract claim against these persons
under Rule 12(b)(6) and entered summary judgment in their favor on  
MSL's remaining claims.
    Our review is swift because "[w]e have steadfastly deemed
waived issues raised on appeal in a perfunctory manner, not
accompanied by developed argumentation."  United States v.
Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997).  An issue lacks
developed argumentation if the appellant merely mentions it as "a
possible argument in the most skeletal way, leaving the court to do
counsel's work."  United States v. Zannino, 895 F.2d 1, 17 (1st
Cir. 1990).
    This is such a case.  MSL's brief focuses mainly on the
ABA and does not  make any real attempt to construct a reasoned
argument that would call into legitimate question the district
court's rulings with regard to the Six Individual Defendants.  Of
course, with a record appendix that boasts more than 6,500 pages,
MSL has furnished a welter of paper, but it has not arrayed these
plethoric evidentiary materials in any systematic way vis--vis
these defendants.  Instead, MSL strives to bind together several
mounds of proof, quasi-proof, and unsubstantiated allegations
together with desultory rhetoric.  More is required to pass muster
under Bongiorno and Zannino.  Accordingly, MSL has forfeited any
objection to the lower court's entry of judgment in favor of the
Six Individual Defendants.
X.  THE RULE 56(f) MOTION
    Fed. R. Civ. P. 56(f) provides:
         Should it appear from the affidavits of a
    party opposing [a motion for summary judgment]
    that the party cannot for reasons stated
    present by affidavit facts essential to
    justify the party's opposition, the court may
    refuse the application for judgment or may
    order a continuance to permit affidavits to be
    obtained or depositions to be taken or
    discovery to be had or may make such other
    order as is just.

MSL contends that the district court erroneously denied its motion
for further discovery under Rule 56(f).  This contention lacks
force.
    We first set the stage.  The ABA and the Six Individual
Defendants moved for dismissal on March 29, 1996.  The AALS filed
a motion for summary judgment on the same date.  MSL opposed both
motions and the court heard oral arguments on June 7.  Three weeks
later, while the district court still had the motions under
advisement, MSL moved to defer their adjudication until it had
obtained more discovery.  After conferring with all counsel, the
district court denied the Rule 56(f) motion on August 28.  On
September 26, 1996, the AALS filed a supplemental motion for
summary judgment.  Four days later, the ABA and the Six Individual
Defendants filed a joint motion for summary judgment.  MSL again
filed oppositions, but did not renew its Rule 56(f) motion.  The
district court granted the AALS's motion for brevis disposition on
March 3, 1997, and granted the parallel  motion brought on behalf
of the ABA and the Six Individual Defendants on May 8, 1997.
    In this venue, MSL ardently embraces Rule 56(f).  It
contends that the district court acted improvidently in refusing
the requested continuance and proceeding to rule upon the
defendants' dispositive motions.
    To savor the balm of Rule 56(f), a party must act in a
timely fashion.  See Resolution Trust Corp. v. North Bridge
Assocs., Inc., 22 F.3d 1198, 1204 (1st Cir. 1994).  Moreover, the
moving papers must contain a proffer which, at a bare minimum,
articulates a plausible basis for the movant's belief that
previously undisclosed or undocumented facts exist, that those
facts can be secured by further discovery, and that, if obtained,
there is some credible prospect that the new evidence will create
a trialworthy issue.  See Mattoon v. City of Pittsfield, 980 F.2d
1, 7-8 (1st Cir. 1992); Paterson-Leitch Co. v. Massachusetts Mun.
Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir. 1988).  Finally,
the motion must set forth good cause to explain the movant's
failure to have conducted the desired discovery at an earlier date.  
See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 584 (1st
Cir. 1994); Resolution Trust, 22 F.3d at 1205.
    We review the denial of relief under Rule 56(f) for abuse
of discretion.  See Sheinkopf v. Stone, 927 F.2d 1259, 1263 (1st
Cir. 1991).  We discern no abuse  here.  To the contrary, the
record reveals that MSL's attempt to invoke Rule 56(f) was both too
late and too little.
    We deal first with the temporal aspect.  It is firmly
established that a Rule 56(f) motion must be made within a
reasonable time following the receipt of a motion for summary
judgment.  See Resolution Trust, 22 F.3d at 1204.  This means that
a Rule 56(f) motion normally should precede or accompany the
response to the summary judgment motion or follow as soon as
practicable thereafter.  See Paterson-Leitch, 840 F.2d at 988.  Of
course, there may be extenuating circumstances under which "a party
opposing a dispositive motion may not realize until the initial
round of oral argument that he requires additional discovery time."  
Id.  But this is an outer limit, and a Rule 56(f) extension request
made after the conclusion of oral argument on a summary judgment
motion ordinarily comes too late.  See  C.B. Trucking, Inc. v.
Waste Mgmt., Inc., ___ F.3d ___, ___ (1st Cir. 1998) [No. 96-2347,
slip op. at 8 n.2]; Ashton-Tate Corp. v. Ross, 916 F.2d 516, 520
(9th Cir. 1990); Dowling v. City of Philadelphia, 855 F.2d 136, 140
(3d Cir. 1988); Pfeil v. Rogers, 757 F.2d 850, 856-57 (7th Cir.
1985).
    Measured against these temporal benchmarks, MSL's motion
 which was not made until three weeks after oral argument on the
defendants' initial set of dispositive motions   was out of time.  
Nor do sufficiently excusatory circumstances exist.  At the time it
instituted this action, MSL had been at war with the ABA and the
AALS for roughly two years.  It had received amplitudinous
discovery in the antitrust case and knew   or should have known   
immediately upon receipt of the defendants' dispositive motions
whether it needed more information to oppose them.  There is no
readily apparent reason why MSL procrastinated in deploying Rule
56(f), and MSL fails to offer any persuasive explanation for the
delay.
    Although we could affirm the district court's denial of
Rule 56(f) relief on this basis alone, the ruling also rests on
solid substantive grounds.  The plaintiff accompanied its motion
with an affidavit, executed by Dean Velvel, that described the
facts it hoped to unearth through further discovery.  By and large,
these facts pertain to the existence and operation of the
ostensible conspiracy between the ABA and the AALS.  But MSL did
not suggest below, and does not suggest here, how these new
materials would palliate the force of the ABA's and the AALS's res
judicata defense.
    That omission undermines MSL's position.  Whatever other
issues originally may have lurked in the penumbra of the
defendants' motions, the stark reality is that MSL's action
founders because it could have raised its state-law claims in MSL
I, but did not do so.  No additional discovery can alter that
reality.  Thus, the short answer to MSL's protest about truncated
discovery is that, as against the ABA and the AALS, the district
court's refusal to grant a Rule 56(f) continuance was harmless.
    Substantively speaking, there is yet another obstacle
blocking MSL's path.  A party relying on Rule 56(f) must
demonstrate that he exercised due diligence in pursuing discovery.  
See C.B. Trucking, ___ F.3d at ___ [slip op. at 9]; Ayala-Gerena v.
Bristol Myers-Squibb Co., 95 F.3d 86, 92 (1st Cir. 1996).  The
district court denied MSL's motion to remand on January 18, 1996.  
Insofar as we can tell, MSL thereafter failed to take steps
reasonably available to it to secure discovery.  We explain
briefly.
    The District of Massachusetts operates under an
"automatic discovery" paradigm.  See Fed. R. Civ. P. 26(a)(1); D.
Mass. Loc. R. 26.2 (1996).  The court's local rules provide that
unless otherwise ordered by a judicial officer, a "party must
provide to other parties disclosure of the information and
materials called for by [the automatic discovery rule]" before that
party can initiate further discovery.  D. Mass. Loc. R. 26.2(A).  
The record contains no evidence that MSL complied with its
automatic discovery responsibilities, that it attempted to initiate
any discovery, or that it sought permission from a judicial officer
to do so.  What is more, Judge Lasker issued a scheduling order on
February 28, 1996, in which he admonished all counsel that, if
discovery could not be effectuated consensually, "motions to compel
discovery may be filed in accordance with the provisions of Local
Rule 26.2(C)."  MSL never filed any such motion.
    We will not paint the lily.  Rule 56(f) is designed to
"minister[] to the vigilant, not to those who slumber upon
perceptible rights."  Paterson-Leitch, 840 F.2d at 989 n.5
(internal quotation marks and citation omitted).  Given its
lethargic approach to discovery, MSL cannot now be heard to
complain about the district court's refusal to stay proceedings on
the summary judgment motions.  See Mattoon, 980 F.2d at 8; Hebertv. Wicklund, 744 F.2d 218, 222 (1st Cir. 1984).
    To this point, we have focused on the ABA and the AALS.  
Nonetheless, the upshot is the same across the board.  With regard
to the fourteen individual defendants, the affidavit that
accompanied the Rule 56(f) motion mentions only one   Steven Smith
 and only mentions him in the most inconsequential manner.  The
affidavit does not refer to NESL.  Therefore, the record does not
sustain a claim that discoverable materials actually existed that
would have raised a trialworthy issue as to any of these fifteen
defendants.
XI.  CONCLUSION
    We need go no further.  MSL adduces other arguments, but
none of them requires elaboration.  It suffices to say that David
does not always best Goliath.   

    Affirmed.

</body>

</html>